JERRY E. PRITCHETT AND PATRICIA D. PRITCHETT, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 14586–81, 18127–81, 18128–81, 18477–81, 27413–82.  Filed October 24, 1985

[1]Cases of the following petitioners are consolidated herewith: Donald R. Clifford and Joyce K. Clifford, docket No. 18127–81; Alex Indich and Mira Indich, docket No. 18128–81; Arthur Knox, docket No. 18477–81; and Richard J. Buchbinder and Voren L. Buchbinder, docket No. 27413–82.

*Marc Marmaro* and *Michael Constas*, for the petitioners.
*Karl D. Zufelt*, for the respondent.

JACOBS, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioners | Taxable year | Deficiency |
|---|---|---|---|
| 14586–81 | Jerry E. Pritchett and Patricia D. Pritchett | 1977 | $33,336 |
| 18127–81 | Donald R. Clifford and Joyce K. Clifford | 1977 | 3,270 |
| 18128–81 | Alex Indich and Mira Indich | 1977 | 30,492 |
| 18477–81 | Arthur Knox | 1977 | 7,175 |
| 27413–82 | Richard J. Buchbinder and Voren L. Buchbinder | 1976 | 11,583 |

The issue for decision is whether petitioners, as limited partners in five similar limited partnerships engaged in oil and gas drilling operations, are "at risk" within the purview of section 465[2] for their proportionate shares of notes given by the partnerships to a drilling company under turnkey drilling agreements. If petitioners are not at risk for their proportionate shares of these notes, then the deductions for their distributive shares of partnership losses are limited to the amounts of their cash contributions to the partnerships. If, however, petitioners are at risk for their proportionate shares of the partnership notes, then the deductions for their distributive shares of partnership losses are allowable in their entirety.

---

[2]All section references are to the Internal Revenue Code of 1954 as in effect during the taxable years at issue, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

All petitioners resided in California when they filed their petitions. Each male petitioner[3] is a limited partner in one of five similar limited partnerships (cumulatively referred to as the partnerships). The promoters and general partners of each partnership were Albert Prager and Michael Traiger. Each partnership was formed to conduct oil and gas drilling operations. One of the partnerships (T & P, LTD.) was organized under California law in December 1976; the other four were organized under Nevada law in December 1977. The partnership in which each petitioner held an interest, the year formed, the amount of each partner's initial cash contribution thereto, and the total partnership capitalization for each of the five limited partnerships are as follows:

| Petitioner | Partnership | Year formed | Initial cash contribution to partnership | Total partnership capitalization |
|---|---|---|---|---|
| Jerry Pritchett | Alluf, Ltd. | 1977 | $35,000 | $412,500 |
| Donald Clifford | Altar, Ltd. | 1977 | 5,000 | 645,000 |
| Alex Indich | Aaron, Ltd. | 1977 | 35,000 | 705,000 |
| Arthur Knox | Akiba, Ltd. | 1977 | 5,000 | 465,000 |
| Richard Buchbinder | T & P Ltd. | 1976 | 12,500 | 725,000 |

All five partnerships engaged in drilling operations through a series of essentially identical transactions with Fairfield Drilling Corp. (Fairfield), a wholly owned subsidiary of Petroleum Development Corp. (PDC), a publicly held corporation. On December 29, 1977, Fairfield assigned to the partnerships (December 29, 1976, in the case of T & P) rights to certain oil and gas leases which it held. In exchange therefor, the partnerships agreed to pay Fairfield a royalty equal to 20 percent of the gross sales proceeds of the oil and gas extracted from the leased land, except that the royalty did not commence until the assignee-partnership received a specified amount of net profits. Concurrent with the assignment of the oil and gas leases, Fairfield and each partnership executed a

---

[3]The term "petitioner" and "petitioners" will exclude wives, where applicable, as only the husbands were limited partners in the partnerships involved herein.

turnkey drilling agreement, a completion and operation agreement, and an equipment lease agreement. As a result of these agreements, Fairfield agreed to drill and develop the leased oil and gas properties of the partnership, and to provide all necessary equipment to commercially exploit all productive wells.

Pursuant to the turnkey drilling agreement, each partnership paid cash and executed a recourse note to Fairfield in 1977 (1976 with respect to T & P) in amounts as follows:

| Partnership | Amount of cash | Amount of note[4] | Total |
|-------------|---------------|-------------------|-------|
| Alluf | $412,500 | $433,125 | $845,625 |
| Altar | 645,000 | 677,250 | 1,322,250 |
| Aaron | 705,000 | 740,250 | 1,445,250 |
| Akiba | 465,000 | 488,250 | 953,250 |
| T & P | 725,000 | 761,250 | 1,486,250 |

Each note (the Fairfield note) was non-interest-bearing and had a maturity of 15 years. Each was secured by virtually all of the maker-partnership's assets. The principal for each Fairfield note was payable from the net cash available to the partnership as a result of its drilling operations. Only the general partners were personally liable under the Fairfield note; however, each limited partnership agreement (as well as the certificate of limited partnership) provided that in the event the Fairfield note was not paid in full at maturity, the limited partners of the maker-partnership would be personally obligated to make additional capital contributions to the maker-partnership sufficient to cover the deficiency once called upon by the general partners to do so.[5]

---

[4] The amount of each note is exactly equal to 105 percent of the amount of cash.

[5] The certificates of limited partnership for each partnership and, with slight variations, the limited partnership agreement provided as follows:

"If there are not sufficient revenues to pay the entire principal amount of the recourse promissory drilling note by December 31, 1992, then the general partners will by written notice call for additional capital contributions in an amount sufficient to pay the outstanding balance of said promissory note. The total additional capital contributions shall be allocated among the limited partners in the proportion that the initial capital contribution of each limited partner bears to the initial capital contributions of all of the limited partners. Each limited partner shall be obligated to pay in cash to the partnership, on or before the specified due date set forth in the written notice from the general partners, given not less than thirty (30) days before such date, the amount set forth in such notice. * * *"

Four of the five petitioners testified that they believed that they would be unconditionally liable for future additional capital contributions to their respective partnerships if called upon to make

Each partnership elected to employ the accrual method of accounting and to deduct intangible drilling costs (I.D.C.) as an expense pursuant to section 1.612–4, Income Tax Regs. Accordingly, each partnership deducted the entire amount paid to Fairfield (the total of the cash and the note) under the turnkey drilling agreement in the initial year. As there was no income in that year, each partnership reported a loss equal to its entire I.D.C.[6]

The partnership agreement provided that all losses were to be allocated among the limited partners in proportion to their respective capital contributions.[7] Each petitioner deducted his distributive share of the partnership loss, as set out in the following table (which also lists their cash contributions):

| Petitioner | Distributive loss | Cash contribution |
|---|---|---|
| Jerry Pritchett | $71,750 | $35,000 |
| Donald Clifford | 10,250 | 5,000 |
| Alex Indich | 71,750 | 35,000 |
| Arthur Knox | 10,250 | 5,000 |
| Richard Buchbinder | 25,625 | 12,500 |

Respondent disallowed the deduction taken by each petitioner for his distributive share of the partnership loss to the extent it exceeded his cash contribution.

---

such contributions by the general partners. The fifth petitioner did not testify. It is noteworthy that with respect to the four petitioners who testified, three failed to list as a liability on financial statements submitted in connection with loans the obligation to make additional capital contributions; the fourth never sought a loan and hence was not required to prepare a financial statement.

[6]The loss of each partnership in its initial taxable year was reported as follows:

| Partnership | Loss (cash and note) | | |
|---|---|---|---|
| Alluf | $845,625 | ($412,500 + | $433,125) |
| Altar | 1,322,250 | (645,000 + | 677,250) |
| Aaron | 1,445,250 | (705,000 + | 740,250) |
| Akiba | 953,250 | (465,000 + | 488,250) |
| T & P | 1,486,250 | (725,000 + | 761,250) |

[7]The limited partners were to receive 94 percent of the profits and distributions of the partnership until such time as the full amount of their original capital contributions were returned to them; thereafter, they were to receive 70 percent of the profits and distributions. Partnership distributions were to be made at such time and in such amounts as, in the sole discretion of the general partners, the business affairs and financial circumstances of the partnership permitted, provided that no distribution would be made if such would impair the financial liquidity of the partnership or would otherwise tend to render the partnership insolvent.

OPINION

The ultimate question to be resolved is whether, as a limited partner, each petitioner may deduct his entire distributive share of partnership loss for the taxable year involved, or whether the deduction is limited to petitioner's actual cash contribution to his partnership. Resolution of this question depends upon whether each petitioner is at risk on the Fairfield note.

Generally, an individual may deduct, on his own tax return, his distributive share of losses of a partnership in which he is a member. Sec. 702(a). However, there are statutory provisions that restrict the extent to which a partner may deduct his share of partnership losses. See secs. 704(b), 704(d), and 465(a). Respondent relies upon section 465 to restrict the amount of partnership loss which can be deducted by each petitioner.[8]

Section 465 was added to the Code by the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1531, and is applicable to taxable years beginning after December 31, 1975. It was enacted to combat a perceived abuse which allowed a taxpayer to deduct tax losses in excess of the amount of his economic investment. S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 86.

Section 465 limits the deductibility of losses arising from certain activities, including oil and gas exploration, to the amount for which the taxpayer is at risk for such activity at the close of the taxable year. In general, a taxpayer is considered at risk for the amount of money (or basis of property) that he has contributed to the partnership, as well as amounts borrowed with respect to the activity. Sec. 465(b)(1). Section 465(b)(2) defines the term "borrowed amount" for purposes of section 465. Simply stated, as relevant to this case, a borrowed amount must both (1) be an amount borrowed for use in the oil and gas exploration, and (2) create an obligation on which the petitioner is personally liable.

A taxpayer is not considered at risk for any amount borrowed from any person with an interest in the partnership other than an interest as a creditor. Sec. 465(b)(3)(A) and (B)(i).

Respondent, contending that each petitioner was at risk only for his initial cash contribution, disallowed the deduction

---

[8]The "at risk" rules of sec. 465 override the provisions of sec. 704(d) and related provisions, including sec. 1.752–1(e), Income Tax Regs. S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 87.

taken by each petitioner for his distributive share of the partnership loss to the extent it exceeded his cash contribution. Respondent first argues that neither the potential cash call nor the Fairfield notes constitute amounts borrowed within the purview of section 465. Respondent alternatively argues that, even if the Fairfield notes constitute amounts borrowed within the purview of section 465, petitioners are not at risk with regard to the Fairfield note since it represents an amount borrowed from a person[9] (Fairfield) with an interest in the partnership other than that of a creditor.

Petitioners, on the other hand, contend that the amount for which they are at risk includes their proportionate share of the Fairfield note. The thrust of petitioners' argument is that the cash call, coupled with the recourse nature of the Fairfield note, operates to make petitioners personally liable (through liability to their respective partnerships) to Fairfield (a person who petitioners contend is without an interest in their respective partnerships) for an amount borrowed with respect to the activity. Petitioners argue that they should be considered at risk to the extent of their proportionate shares of their respective partnerships' liability to Fairfield under section 465(b)(1)(B) and (2)(A). We disagree.

The potential cash calls (even if they might be considered obligations on which petitioners are personally liable) are not amounts borrowed for use in the oil and gas exploration activity of the partnership. Hence, the potential cash calls do not satisfy the first criterion set forth in section 465 (b)(2) which defines a "borrowed amount" for purposes of section 465. On the other hand, the Fairfield notes are amounts borrowed for use in the oil and gas exploration activities of the partnerships. But they are not amounts borrowed for which the petitioners are personally liable, as determinable at the close of the taxable year at issue.

State law defines the relationship among limited partners, the partnership, and creditors of the partnership. Both California and Nevada (the two States in which the partnerships

---

[9]Sec. 7701(a) provides:

SEC 7701(a). When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

(1) PERSON.—The term "person" shall be construed to mean and include an individual, a trust, estate, partnership, association, company, or corporation.

involved were formed) have adopted the Uniform Limited Partnership Act (ULPA). Ordinarily, under the ULPA, a limited partner is not personally liable for partnership obligations. Cal. Corp. Code sec. 15501 (West 1977); Nev. Rev. Stat. sec. 88.020 (1979). Therefore, generally, a limited partner is not at risk for any portion of the debt of his partnership, even if the debt is recourse. Sec. 465(b)(2)(A); see sec. 1.465–24(a)(2)(i), Proposed Income Tax Regs., 44 Fed. Reg. 32242 (June 5, 1979). Only general partners ordinarily have personal exposure with respect to the debt of a limited partnership, and therefore, ordinarily only general partners are at risk.

However, there may be circumstances where a limited partner would be liable for some portion of the partnership debt. The ULPA provides that a "contributor, unless he is a general partner, is not a proper party to proceedings * * * against a partnership, *except where the object is to enforce a limited partner's * * * liability to the partnership.*" (Emphasis added.) Cal. Corp. Code sec. 15526 (West 1977); Nev. Rev. Stat. sec. 88.270 (1979); see *Richard Matthews, Jr., Inc. v. Vaughn,* 91 Nev. 583, 540 P.2d 1062 (1975). A limited partner is liable to the partnership under the ULPA for (a) "the difference between the contribution as actually made and that stated in the certificate as having been made" and (b) "any unpaid contribution which he agreed in the certificate to make in the future *at the time and on the conditions stated in the certificate.*" (Emphasis added.) Cal. Corp. Code sec. 15517(1)(a) and (b) (West 1977); Nev. Rev. Stat. sec. 88.180(1)(a) and (b) (1979). Accordingly, limited partners may be named as defendants in a suit brought against the partnership by a creditor for satisfaction of a partnership debt where the limited partners are obligated to the partnership for unpaid contributions.

Petitioners posit that they are currently obligated to make future contributions to their respective partnerships. They further posit that Fairfield, as a creditor of the partnerships, could force the limited partners to satisfy this obligation to the partnership. From these premises petitioners conclude that they are personally liable to Fairfield under the Fairfield notes. The flaw in this syllogism is that petitioners are only contingently obligated to make future contributions to their respective partnerships if and when called upon by the general partner to do so. Therefore, they are not currently personally

liable to Fairfield. Moreover, the cash call, as provided for in the certificates of limited partnership, is not an "unpaid contribution" which would make the limited partners personally liable under the ULPA to the partnerships in 1976 or 1977.

Each petitioner can be required to make an additional contribution to his partnership if on December 31, 1992[10], there is an unpaid balance on the Fairfield note. However, by the close of each taxable year in issue (1976 or 1977), such a requirement was merely a contingency since it was not known in 1976 or 1977 (a) whether there would or would not be sufficient partnership revenues to satisfy the Fairfield note prior to or on maturity of the note, or in the event the Fairfield note was not satisfied in full on maturity, the amount of the capital contributions needed to cover the deficiency, or (b) if the general partners would in fact exercise their discretion to make the cash call if an unpaid balance on the Fairfield note were to exist on December 31, 1992.[11] Hence, as of the close of the taxable year in issue, petitioners had no current ascertainable liability to their partnerships for future contributions.[12]

Our holding comports with the common law contract principle that a contingent debt does not reflect a present liability. A debt is an unconditional promise to pay a sum certain in money or money's worth on demand or on a specific date. As long as it is subject to a contingency, it is not a debt on which present liability has accrued. See *Gilman v. Commissioner*, 53 F.2d 47, 50 (8th Cir. 1931).

Petitioners' brief cites *Donroy, Ltd. v. United States*, 301 F.2d 200 (9th Cir. 1962); *Linder v. Vogue Investments, Inc.*, 239 Cal. App. 2d 338, 48 Cal. Rptr. 633 (1966); *Indiana Mortgage & Realty Investors v. Spira-Mart of Lansing*, 115 Mich. App. 141, 320 N.W.2d 320 (1982); and *Robinson v. McIntosh*, 3 E.D. Smith 221 (N.Y.C.P. 1854), to support their contention that "the Uniform Act has allowed creditors such as Fairfield to directly enforce the agreement of the limited partners of each Partnership to contribute their pro rata share of the unpaid balance of the Notes." We find petitioners' reliance upon these decisions to be misplaced.

---

[10]Dec. 31, 1991, for petitioner Buchbinder.

[11]Dec. 31, 1991, for petitioner Buchbinder.

[12]The certificates of limited partnership provide for the cash call only at the stated maturity date.

Each of those cases involved limited partners who either withdrew their stated investment or were relieved from their obligation to make the total contribution to the partnership stated in the certificate, after debts had been incurred by the partnerships involved, thereby impairing the creditors' rights upon default. The cases proceeded on the theory that the assets of the partnership should be available to liquidate its debt, regardless of whether those assets are in the possession of the partnership or the partners. The creditor was permitted to pursue the party in possession; he was not hindered by a collusive act aimed at defeating his claims. See Cal. Corp. Code secs. 15516, 15517(3) and (4), and 15523 (West 1977); Nev. Rev. Stat. secs. 88.170, 88.180(3) and (4), and 88.240 (1979).

Here we are faced with no such situation. Fairfield's rights have not been impaired during the years in issue. Assuming, without deciding, that under *Donroy* and the other cases cited by petitioners, Fairfield might eventually have a direct path to petitioners in the event the partnership debt matured unsatisfied, our holding would not be altered. The "at risk" inquiry for purposes of section 465 is an annual one made on the basis of the facts existing at the end of each taxable year. S. Rept. 94-938, 1976–3 C.B. (Vol. 3) 49, 86. Before and during the years in issue there was no collusive release of the limited partners from their obligations to make future capital contributions; we need not speculate as to what might happen in some subsequent year. Thus, as of the end of each taxable year (1976 or 1977), Fairfield had no established recourse on its notes against petitioners; therefore petitioners are not liable on those notes.

In summary, we find nothing in the ULPA, as enacted or interpreted in California and Nevada, that would saddle petitioners with liability for the Fairfield note.

Petitioners have posited still an additional theory to support their contention that they are personally liable on the Fairfield note. Specifically, they argue that Fairfield is a third party beneficiary of the contract (the limited partnership agreement) between the partnerships and the limited partners to make future contributions to satisfy any outstanding principal balance on the Fairfield note, and as such, Fairfield may proceed against the limited partners directly to enforce this obligation. Petitioners contend that this satisfies the

criteria of section 1559 of the California Civil Code, which provides that "A contract, made *expressly* for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it" (emphasis added). The requirement for an additional contribution by the limited partners, according to petitioners, is *expressly* designed to protect Fairfield in the event of a shortfall in the partnership assets. Therefore, they contend, Fairfield may enforce it against the limited partners.

Accepting, arguendo, petitioners' contention that the third party beneficiary doctrine as enacted by section 1559 in California applies in this situation, we nevertheless conclude that Fairfield has no recourse against the limited partners at the close of the taxable years at issue.

On the basis of the foregoing, we hold that petitioners are not personally liable for any portion of the partnership notes to Fairfield either under the ULPA or by the third party beneficiary doctrine at the close of the taxable years at issue.[13]

Having found that petitioners have no personal liability on the Fairfield note,[14] we hold that they are at risk only for the actual cash contribution made as of the close of the taxable years at issue.[15] So found, we need not address the issues involving Fairfield's interest in the activity.

To reflect the foregoing,

*Decisions will be entered for the respondent.*

---

[13]We note sec. 1.465–22(a), Proposed Income Tax Regs., 44 Fed. Reg. 32238 (June 5, 1979), which requires as an omission from the amounts considered at risk, that sum "which the partner is required under the partnership agreement to contribute until such time as the contribution is actually made." This proposed regulation, at least as it applies to the facts with which we are here involved, comports with the general scheme of sec. 465, which is to prevent an artificial inflation of the amounts considered at risk beyond those amounts which the taxpayers actually stand to lose as of the close of the taxable year at issue.

[14]It could be argued that satisfaction of the Fairfield note will ultimately be borne by petitioners, either through a reduction of distributions from their respective partnerships or by the payment of additional capital contributions. We do not accept such argument because it ignores the fact that the obligation to Fairfield is that of the partnerships (and not of the partners) and that the limited partners are entitled to receive partnership distributions only at such times and in such amounts as the general partners determine, and only if such would not impair the partnerships' ability to satisfy their obligations.

[15]Cf. *Brand v. Commissioner*, 81 T.C. 821 (1983), where we held that a limited partner who had guaranteed a partnership obligation was not at risk on the partnership obligation.

Reviewed by the Court.

STERRETT, GOFFE, CHABOT, PARKER, SHIELDS, and CLAPP, JJ., agree with the majority opinion.

GERBER, J., did not participate in the consideration of this case.

———

SIMPSON, J., concurring: I agree with the result reached by the majority. However, there are a variety of circumstances which have influenced my conclusion, and I wish to mention them.

The objective of section 465 is to limit deductions for losses to amounts at risk, and to carry out that objective, we must be assured that an amount is truly at risk. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 86. To carry out that responsibility, we must examine all the surrounding circumstances to ferret out the true substance of the transaction. An obligation by a partner to make additional contributions does not, standing by itself, create an amount at risk since the obligation is clearly owed to a person, the partnership, having an interest in the activity. An obligation to make additional contributions can result in an amount being at risk only if that obligation is coupled with a recourse obligation by the partnership. See 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 8.03, at 8-11 to 8-12, and par. 10.11[2][b], at 10-78 to 10-79 (1977); Kalish & Rosen, "The Risky Basis for Partnership Allocations," 38 Tax Lawyer 119, 140-141 (1984). Thus, to determine whether the promise by the petitioners in this case results in an amount at risk, we must inquire into the substance of the notes to Fairfield.

At the outset, it should be pointed out that those notes do not bear interest. Although they purport to call for the payment of amounts ranging from $400,000 plus to $700,000 plus in 1992, they do not create a current obligation to pay such amounts. An obligation to pay $100 in 15 years without interest is currently worth only $23 if we assume that the customary interest rate for such an obligation is 10 percent. C. Nickerson, Accounting Handbook for Nonaccountants 575 (1975). Hence, at most, the notes represent a current obligation of less than 25 percent of the stated amounts.

In addition, an amount borrowed is not considered to be at risk unless the obligation is owed to a person not having an interest (other than as a creditor) in the activity. Sec. 465(b)(3). Here, Fairfield was not disinterested in the activities of the partnerships. The partnerships acquired the oil and gas leases from Fairfield, and in addition, Fairfield and the partnerships entered into turnkey drilling agreements, completion and operation agreements, and equipment lease agreements. As a part of the transactions, Fairfield acquired a right to 20 percent of the gross sales proceeds of the oil and gas extracted from the leased lands, payable only after the partnerships had achieved certain levels of profits. These arrangements gave Fairfield a substantial interest in the activities of the partnerships.

Furthermore, the liability of the limited partners, such as the petitioners, is, by its terms, contingent upon the general partners' exercise of their right to call upon the limited partners for contributions. It is easy to imagine a situation in which the general partners might be financially irresponsible and have no interest in attempting to collect from the limited partners to satisfy the notes held by Fairfield. In such a situation, a question would arise as to whether Fairfield could enforce contributions by the limited partners. There is some authority for believing that Fairfield could enforce the obligations (Cal. Corp. Code sec. 15517(3) (West 1977); Cal. Civ. Code sec. 1559 (West 1982); *Lucas v. Hamm*, 56 Cal. 2d 583, 15 Cal. Rptr. 821, 824 (1961); *Gilbert Financial Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65, 145 Cal. Rptr. 448 (1978)), but it is far from a settled matter (2 Restatement, Contracts 2d, sec. 302 comment b (1979)).

In summary, the liability of the limited partners is far from clear and certain, and under such circumstances, to carry out the objective of section 465, they should be required to postpone the recognition of their losses until they actually make additional contributions. The effect of our decision is not to deny them a deduction altogether: if income of a partnership is used to pay off its note to Fairfield, each limited partner will be taxable on his distributive share of such income; but at the same time, he is treated as making an additional contribution of such share, and he will be entitled to carry over any loss not previously recognized and deduct that loss against such

income. Sec. 465(a)(2); S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 88 n. 8. If he ultimately makes additional contributions as a result of the call arrangement, he will be entitled to deduct, at that time, losses not previously allowed. Sec. 465(a)(2) and (b)(1)(A).

STERRETT, GOFFE, and SWIFT, *JJ.*, agree with this concurring opinion.

---

WHITAKER, *J.*, dissenting: If the facts as found support the alternative analysis posited in Judge Simpson's concurring opinion, and I am not certain that they do, then the majority may have inadvertently reached the right result, although for the wrong reasons. But I strongly disagree with the majority's deference to State law characterizations of general and limited partners, with the majority's approach to the application of section 465[1] and finally with the majority's conclusion that the liability of the limited partners is contingent. With respect to the "contingent" issue, I agree with Judge Cohen's analysis and have joined in her dissent.

Generally, under State law, it is only a limited partner whose personal liability can be confined to that amount of property which he contributed or is required to contribute to the partnership;[2] a general partner is liable for all recourse obligations of the partnership. Personal liability exposes the personal assets of the responsible person to payment of the obligation; it stands in contrast to limited liability, which exposes only the collateral pledged as security for satisfaction of the obligation.[3] Neither requires that the liability be presently payable. State law definitions envision a clear distinction as to the presence or absence of personal liability in

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Cal. Corp. Code sec. 15517(1)(a) and (b) (West 1977); Nev. Rev. Stat. sec. 88.180(1)(a) and (b) (1979).

[3] In distinguishing between the characteristics of corporations and partnerships, sec. 301.7701–2(d)(1), Income Tax Regs., defines limited and personal liability as follows:

(d) *Limited liability.*—(1) An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim. * * *

connection with third party obligations. While State law must be applied in determining the rights and liabilities of partners to each other and to third parties, it is Federal law that controls the manner in which these rights and liabilities are to be taxed. *Lyeth v. Hoey,* 305 U.S. 188 (1938); *Helvering v. Stuart,* 317 U.S. 154 (1942). Labels, whether mandated by State law or adopted by the parties, are unimportant. This is especially true when undertaking to determine basis and applying the "at risk" rules to partners.

We are concerned here with Federal taxation of a limited partner who has made himself personally liable in a capacity analogous to that of a general partner with respect to a particular partnership obligation. In that situation, one commentator has suggested:

that the courts should not attempt to pigeonhole a limited partner who is liable as a general partner into one category for all purposes of taxation, rather, they should determine the underlying congressional policy of the operative Code provision and make a de facto analysis on a case-by-case basis.[4]

From a practical as well as an economic point of view, a limited partner who has assumed a pro rata part of a partnership recourse liability is the equivalent of a general partner, especially where, as here, the general partner, with respect to the same liability, has limited his liability by the contractual call upon the limited partners.[5]

On the facts before us, both general and limited partners are personally liable for a pro rata portion of the partnership's recourse obligation to Fairfield. Being similarly situated, they should be treated equally for Federal tax purposes unless the statute compels us to do otherwise, which it does not. Consequently, to the extent that the majority opinion distinguishes between, and turns upon, State law characterizations of

[4]Banoff, "Tax Distinctions Between Limited and General Partners: An Operational Approach," 35 Tax L. Rev. 1, 26 (1979).

[5]For an excellent discussion of both basis and "at risk" in the partnership context, see Kalish & Rosen, "The Risky Basis for Partnership Allocations," 38 Tax Lawyer 119 (1984). In pertinent part these authors at page 133 assert that:

"The thrust of the rules for sharing recourse liabilities is to allocate the liabilities to the partners who would be required to satisfy the liabilities out of their personal assets in the event of a default by the partnership. A limited partner who is obligated to make additional capital contributions if necessary to satisfy a recourse creditor is in precisely the same situation as a general partner with regard to the recourse creditor."

general and limited partners, it may be correct for State law purposes,[6] but for Federal tax purposes the majority ignores both form and substance and unduly extends section 465.

The majority's application of section 465 fails to recognize the relationship between the basis and the "at risk" provisions. Section 465 merely suspends what would otherwise be an allowable deduction. S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 86. The amount of depreciation or other deductions which a partner is permitted to take is initially limited to the amount of his basis in the partnership. Sec. 704(d). *Kingbay v. Commissioner*, 46 T.C. 147, 151 (1966). Thus, in the absence of basis, there is no deduction to suspend. A determination of basis, therefore, is a prerequisite to the application of the "at risk" provisions.

A partner's share of partnership liabilities is treated as a contribution of money by the partner to the partnership resulting in an increase in the partner's adjusted basis. Sec. 752. Each partner's share of recourse liabilities is initially determined in accordance with the ratio in which the partners share losses under the partnership agreement. Sec. 1.752–1(e), Income Tax Regs. A limited partner's share of recourse liabilities, however, may not exceed the difference between his actual contribution to the partnership and the total contribution that he is obligated to make under the limited partnership agreement. Sec. 1.752–1(e), Income Tax Regs. Consequently, a limited partner's basis in his partnership interest can be increased by his share of partnership recourse obligations to the extent that he is obligated to make additional contributions to the partnership.

At page 588, the majority states that "the cash call, as provided for in the certificates of limited partnership, is not an 'unpaid contribution' which would make the limited partners personally liable under the ULPA."[7] While there may be

---

[6]Both the majority and the concurring opinions touch upon the right of Fairfield to sue the limited partners to enforce the cash call, on the unrealistic assumption that the general partner will not make the necessary demand. The fact of the matter is that State law has not caught up with the contractual devices which partnerships have adopted since 1976 in an effort to comply with the "at risk" rules. Investors apparently have realized that assumption of a deferred obligation is more than offset by present deductions, a fact that Congress, in enacting sec. 465, either did not anticipate or, more likely, was willing to accept.

[7]For personal liability, the majority apparently would require a presently payable obligation in a fixed amount. See Tech. Advice Memo. 8404012 (Oct. 13, 1983), in which the Service takes the position that a limited partner's obligation to make additional capital contributions if the

situations in which a contingency is so remote that an obligation lacks substance and should be ignored, this is not one of them. Under the majority's contingency analysis, the limited partners would acquire basis only when the cash call is complied with, a position contrary to the import of respondent's regulations and inconsistent with the congressional intent to allocate basis to those parties who will be required to utilize their own assets to retire partnership liabilities if the partnership incurs losses. Thus the majority suspends a deduction under section 465 which its own analysis would never have allowed the limited partners to claim under section 752. The majority should, therefore, have forced the parties to focus on basis, rather than deciding the case on an issue which, under the majority analysis, could not be reached. However, as Judge Cohen demonstrates, the limited partners do have personal liability for their respective shares of the recourse liability. Hence, the liability should be included in basis and the loss should be allowed unless otherwise suspended pursuant to section 465. For the reasons articulated by Judge Cohen, the section 465 requirements are met.

As discussed above, the tax consequences under section 465 of transactions involving similarly situated taxpayers should be the same. If a general partner is "at risk" as to a partnership's recourse obligation by virtue of his liability, then a similarly situated limited partner should also be considered "at risk." Each party is "ultimately liable" on the obligation. See *Smith v. Commissioner*, 84 T.C. 889 (1985). Moreover, if the limited partner is not at risk for his share of the obligation, would the majority allocate that part of the debt to the general partner's basis and include it in his amount "at risk"? We think not. The Senate report and section 465(b)(3) restrict the general partner to his own pro rata part of the Fairfield note:

A taxpayer's capital is not "at risk" in the business, * * * to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk"

---

partnership is unable to satisfy its recourse liabilities is too contingent to entitle the limited partner to include his share of the liability in his basis under sec. 1.752–1(e) of the regulations. Excluding this type of contingency from basis is contrary to the basic premise of sec. 752 and the regulations, which generally allocate recourse liabilities among the partners so as to reflect the manner in which they will share the economic burden of the liabilities if the partnership is unable to pay them.

\* \* \* if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person. [S. Rept. 94–938, 1976–3 C.B. (Vol. 3) 49, 87.]

Consequently, no general partner's amount "at risk" can be increased to the extent of the limited partner's cash call obligations. See *Brand v. Commissioner*, 81 T.C. 821 (1983). This could not have been Congress' intent.

The allocation of "at risk" amounts should accrue to the benefit of the partner ultimately bearing the economic risk of default. Any partner, whether general or limited, who is obligated to make good on a partnership's recourse obligation in the event of default is personally liable for purposes of the "at risk" provisions to the extent that he is not otherwise protected against loss. Each partner will be required to use his personal assets only if the partnership assets prove inadequate. The adequacy of the partnership assets, however, does not of itself constitute a contingency affecting a partner's amount "at risk." On these facts, each partner was "at risk" in an amount equal to his pro rata share of the unpaid recourse obligation as of the close of each taxable year.

I recognize that the "at risk" inquiry is an annual one on the basis of facts existing at the end of each taxable year. S. Rept. 94–938, 1976–3 C.B. (Vol. 3) 49, 86. I further recognize that at the end of each of the years in issue, the actual amount which any of these partners may be required to contribute pursuant to the cash call cannot be definitively determined. In theory, no contribution might be required. However, a partner may be personally liable on a recourse obligation which is not presently payable. As to recourse obligations, the test remains whether, and to what extent, a partner is personally liable on the obligation in the event of default.

For these reasons, I would hold that the limited partners have basis and are "at risk" to the extent of their pro rata share of the Fairfield note unless Judge Simpson's speculation should turn out to be accurate.

NIMS, KÖRNER, COHEN, and WRIGHT, *JJ.*, agree with this dissent.

HAMBLEN, *J.*, dissenting: I respectfully dissent. The Court majority, in my opinion, makes an errant approach to the problem presented. Section 465 was enacted to prevent loss deductions in excess of economic investment arising from certain tax shelter activities. The arrangement petitioners entered into appears to have substance, although the at risk value of the Fairfield note is problematical. If so, as Judge Simpson's concurring opinion relates, then we should limit the at risk value of the Fairfield note rather than extend the at risk provisions to situations where cash call requirements within the partnership agreement present additional economic risk to limited partners.

Furthermore, I share Judge Simpson's view, and that of Judge Cohen, that the Court's "at risk" analysis, as applied here, should be firmly focused on and limited to Fairfield's role in the transaction as a person having an interest in the activity other than that of a creditor. Sec. 465(b)(3). The majority approach which focuses on the partnership agreement cash call requirements creates a bad precedent for genuine business transactions structured through limited partnership arrangements. See 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 8.03, at 8–11 to 8–12 and par. 10.11 [2][b], at 10–78 to 10–79 (1977). It is my view that the limited partners here were on par with general partners as far as liability on the Fairfield note is concerned. I, therefore, concur with Judge Cohen's dissent.

NIMS, WHITAKER, COHEN, and WRIGHT, *JJ.*, agree with this dissent.

---

COHEN, *J.*, dissenting: I respectfully dissent. As Judge Whitaker states, the issue is one of Federal tax law. Although we may look to State law to determine the substantive rights and liabilities of the various parties to the transactions, in my view the majority focuses excessively upon the purported uncertainty of creditors' remedies under California law.

The result reached by the majority may indeed be correct on the facts. I share Judge Simpson's impression that Fairfield appears to be a person having an interest in the activity, other than that of a creditor, under section 465(b)(3), and that the

absence of a provision for interest on the notes adds an element of economic unreality to the transactions. This should be explored further by the finder of facts. I cannot, however, join the majority's reasoning that the liability of the limited partners on the notes to Fairfield is "contingent" for the purpose of the "at risk" rules.

The majority cites two reasons for its conclusion at page 588:

the requirement [to make an additional capital contribution] was merely a contingency since it was not known in 1976 or 1977 (a) whether there would or would not be sufficient partnership revenues to satisfy the Fairfield note prior to or on maturity of the note, or in the event the Fairfield note was not satisfied in full on maturity, the amount of the capital contributions needed to cover the deficiency, or (b) if the general partners would in fact exercise their discretion to make the cash call if an unpaid balance on the Fairfield note were to exist on December 31, 1992. * * *

I agree that the second contingency, if it existed, might ultimately negate the liability of the limited partners to make the cash call; in that event, they would not be at risk on the liability to Fairfield. Nowhere does the majority find, however, that the general partners had the unilateral discretion to waive the express undertaking of the limited partners to make the additional contributions if the notes were not satisfied through partnership operations by the maturity date. Such a result would indeed be anomalous as a matter of State law. The references to State law in the majority opinion strongly suggest, and indeed the entire opinion implies, that Fairfield could, at maturity, force the limited partners to make the additional contributions to satisfy the notes.

Thus the determinative "contingency" found by the majority can only be that the partnerships might generate sufficient revenues to satisfy, in full or in part, the notes to Fairfield prior to their maturity date. Whether this possibility renders petitioners' liability "contingent" can best be examined by assuming for a moment that such "contingency" did not exist, i.e., that the notes to Fairfield merely required a single balloon payment on the maturity date and that cash from partnership operations was currently distributable to the partners. Under this assumed scenario, the limited partners' obligations to contribute the additional funds and thereby satisfy the notes on maturity would be certain: the possibility that interim

partnership revenues could discharge that liability would not exist.

The "contingency" relied upon by the majority is thus merely the *acceleration of payment on the notes*, as compared with the posited scenario. If the limited partners are not considered at risk solely because of such "contingency," it is doubtful that any liability could pass muster under section 465. Any indebtedness might be satisfied through cash generated by the leveraged activity or asset. Bona fide investors incurring valid, recourse debt typically hope such will be the case. Section 465(b)(2), however, specifically contemplates that certain borrowed amounts are to be included as amounts at risk.

In enacting the rules under examination, Congress intended to prevent a taxpayer from deducting an amount for which he is not at economic risk. S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 85. The paradigm situation to which the "at risk" rules apply is where the investor incurs nonrecourse debt, on which he has no personal liability and will suffer no economic detriment if the activity generates insufficient revenues to satisfy the debt. S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 87–88. The majority thus distorts and unduly extends the "at risk" rules. Instead of limiting the taxpayer's deduction where the liability is payable *only* out of revenues generated by or assets used in the activity, the majority extends section 465 to situations where the liability *may* be so paid. As the term is used by Congress, whether an investor is *at risk* depends upon the nature of the taxpayer's obligation if the activity is an economic failure, not if it is a success.

The majority apparently attributes significance to the general partners' discretion over distributions to the limited partners. (See note 14.) Because the partnership agreements prescribed specific ratios for partnership distributions, however, the discretion of the general partners merely related to the timing of the distributions. It is incongruous that the possibility that funds would remain in the partnership and not be distributed immediately to the limited partners could render the limited partners not at risk. Distributions from a partnership *reduce* a partner's initial amount at risk. Sec. 7.465–2, –5, Income Tax Regs.; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 89.

The majority states that the limited partners were not liable on the Fairfield notes as of the years in issue because "Fairfield had no established recourse on its notes against petitioners." (Page 589.) This statement confuses the existence of liability with the timing of payment thereon and the means of enforcing such payment. A taxpayer who must make payments on a debt on or before the maturity date has personal liability, and hence is at risk, even though the creditor cannot enforce payment before maturity.

Congress could have prescribed the result reached by the majority by prohibiting deductions with respect to all indebtedness, recourse and nonrecourse alike, or by dealing with various types of debt in greater detail. As we have so frequently said, however, it is not for us to rewrite the statute as enacted.

WILBUR, NIMS, WHITAKER, KÖRNER, and HAMBLEN, *JJ.*, agree with this dissent.