*Decision will be entered under Rule 155.*

DAVID B. FOLLENDER AND IRMA R. FOLLENDER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14625-85.        Filed October 28, 1987.

*John A. Craig, Marc D. Teitelbaum,* and *William F. Conroy,* for the petitioners.

---

[3]See note 2 *supra,* and accompanying text.

*Frank Agostino,* for the respondent.

OPINION

COHEN, *Judge:* Respondent determined a deficiency of $152,613 in petitioners' 1981 Federal income taxes. After concessions, the issues for decision are as follows:

(1) To what extent is petitioner's amount at risk increased by virtue of assuming the primary obligation of the principal, but not the interest, of a recourse purchase note bearing nonrecourse interest.

(2) If we decide the first issue in favor of petitioners, whether nonrecourse interest due on a recourse purchase note and payable solely from gross receipts is "contingent interest" under section 483.[1]

(3) If we decide the first issue in favor of respondent, whether petitioners are liable for the increased rate of interest under section 6621(c), I.R.C. 1986.

FINDINGS OF FACT

The facts of this case have been fully stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference.

Petitioners David B. Follender (petitioner) and Irma R. Follender, husband and wife, resided in Teaneck, New Jersey, when their petition was filed. They filed a joint Federal income tax return for 1981.

Brooke Associates, a New York limited partnership, was organized on April 27, 1981. Brooke Associates issued a private offering memorandum (the offering memorandum) to certain prospective investors. The offering memorandum, which was dated June 30, 1981, and amended August 24, 1981, stated that the purpose of Brooke Associates was to acquire, own, and exploit a feature-length motion picture entitled "Body Heat" ("Body Heat" or the motion picture). The motion picture would be acquired from the Ladd Co. and distributed by Warner Bros., Inc. (Warner Bros.). The offering memorandum summarized certain of its provisions as follows:

---

[1]Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.

*The Offering*

The total offering is a maximum of $2,754,000 composed of 17 Units of limited partnership interests at a price of $162,500 per Unit. Subscriptions for a Unit will require payment of Capital Contributions as follows:

| Date | Per unit | Total |
|---|---|---|
| Upon subscription | $40,000 | $680,000 |
| Jan. 15, 1982 | 91,000 | 1,547,600 [sic] |
| Jan. 15, 1983 | 31,000 | 527,000 |
| Total | 162,000 | 2,754,000 |

The installments due on January 15, 1982 and 1983 will each be evidenced by a full recourse non-interest bearing promissory note and secured by an unconditional, irrevocable bank letter of credit or negotiable certificate of deposit in an amount equal to the installment due.

          *       *       *       *       *       *       *

In addition to the Capital Contributions, *each Limited Partner will be required to assume in writing the primary obligation to repay approximately 5.59% of the Recourse Purchase Note (other than interest thereon)* in the principal amount of $4,600,000, an additional aggregate liability of approximately $258,058 per Unit. [Emphasis supplied.]

The offering memorandum described, among other things, the planned acquisition and distribution of the motion picture. It warned the prospective investor of the risk of loss and the potential for adverse tax consequences. The offering memorandum also anticipated that Brooke Associates would report losses on its partnership returns for the first few years of operation.

On August 27, 1981, Brooke Associates agreed to purchase "Body Heat" from the Ladd Co. for $9,940,000, which was the fair market value of the picture on that date. Pursuant to the terms of purchase, Brooke Associates would deliver to the Ladd Co. $13,000 on closing, a $527,000 short-term purchase money note due in 1983, a $4,600,000 purchase money note, recourse as to principal but not interest, due on January 10, 1991 (the recourse purchase note), and a $4,800,000 nonrecourse purchase money note due on January 10, 1991 (the nonrecourse purchase note). Each purchase money note was secured by a lien on the motion picture and certain proceeds from its exploitation, and the short-term purchase money note was further secured by promissory notes of the limited partners accompanied by letters of credit and/or security deposits.

Each purchase money note bore interest at the rate of 9 percent per annum. Interest on the recourse purchase note and the nonrecourse purchase note is payable on January 10, 1991, unless prepaid on an earlier date. The principal of the recourse purchase note and the nonrecourse purchase note is payable on January 10, 1991, subject to certain prepayments in 1988, 1989, and 1990.

On August 27, 1981, Brooke Associates and Warner Bros. executed an agreement for the distribution of "Body Heat" (the distribution agreement). The term of the distribution agreement was August 27, 1981, through September 30, 1987, subject to consecutive extension periods of 4 years, 20 years, and 30 years at the option of Warner Bros. and subject to earlier termination in the event of foreclosure on the motion picture. Under the distribution agreement, Warner Bros. retained broad discretion regarding the release, exploitation, distribution, and promotion of the motion picture. Warner Bros. made no representations regarding gross receipts, net receipts, or profits to be derived from the motion picture.

The provisions in the distribution agreement describing the consideration to Brooke Associates were complex. Various amounts of receipts attributable to the motion picture would be accrued pursuant to intricate formulae on three levels or "tiers," and the method of accrual, or formula, would vary in each period the term of distribution was renewed. The timing and method of payments of the amounts accrued were also described. The computation of these amounts was subject to an initial calculation of adjusted gross receipts as follows:

Gross receipts
—Warner Bros.' distribution fees
—Warner Bros.' expenses of distribution
—Third-party deferments
—Third-party participation in the gross receipts
—Third-party participation in the net profits

Adjusted gross receipts

For each accounting period, Warner Bros. was required to provide Brooke Associates an earnings statement showing its calculation of adjusted gross receipts.

During the year 1981, the Ladd Co., in the normal course of its business, made prerelease estimates of revenue and expense for the motion picture after the motion picture was completed. These prerelease estimates were based on preview audience sampling techniques, test advertising campaigns, and studies of the public's awareness of the motion picture's stars. Prerelease estimates are made by the Ladd Co. as well as other motion picture companies in order to design the appropriate marketing campaign, to determine how much should be spent on advertising, and to make other business decisions concerning films prior to release. In addition, the Ladd Co. and other motion picture companies use prerelease estimates for corporate budgeting and forecasting purposes. Prerelease estimates are not guarantees of a motion picture's ultimate revenue. Although not considered as highly reliable, they are the best indicator of ultimate profitability available to a producer prior to release of the motion picture. Prerelease estimates are made on a conservative basis, and they do not constitute the producer's estimate of the maximum gross receipts a motion picture will generate.

Prerelease estimates for "Body Heat" indicated to the Ladd Co. that the motion picture would generate gross receipts of between $24,500,000 and $30 million prior to expenses of distribution. Based on these estimates, the Ladd Co. was reasonably confident that the gross revenue required to repay the principal and interest on the purchase note would be realized. If the Ladd Company had had a high degree of confidence that the motion picture would have grossed in excess of $35 million to $40 million, it would not have sold the motion picture. Generally, the Ladd Company would not provide copies of its prerelease estimates to potential purchasers of a motion picture, but the general partners of Brooke Associates were aware of such estimates based on oral conversations with officers of the Ladd Co..

After a motion picture is released, postrelease estimates of ultimate income are generally prepared. These are more reliable than prerelease estimates. Based on the Ladd Co.'s past experience, postrelease estimates generally predict a motion picture's ultimate income with only a 10- to 15-

percent margin of error. While generally reliable, these postrelease projections are still only estimates of anticipated "ultimate income."

"Body Heat" was released on August 28, 1981. The postrelease estimates of the Ladd Co. for September 30, 1981, and December 31, 1981, were both $24,500,000.

The useful life of a motion picture is generally 3 to 5 years. There are instances, however, when a picture's useful life is less than 3 years or greater than 5 years. As a general rule, a motion picture generates most of its gross receipts within 3 to 5 years of its release, but a motion picture may generate gross receipts for an indefinite period.

Petitioner became a limited partner in Brooke Associates on August 25, 1981, when he subscribed for one unit of limited partnership interest. Petitioner made capital contributions to Brooke Associates of $40,000 on subscription, $91,000 on January 15, 1982, and $31,000 on January 15, 1983. Petitioner also executed a Ladd recourse purchase note assumption agreement in which he assumed, by virtue of his purchase of one unit, the primary obligation to make due and punctual payment of a $257,058 portion of the principal amount of, but not interest on, the recourse purchase note due in 1991.

Brooke Associates claimed a taxable loss in 1981 based on deductions for depreciation, payment of its interest expenses, and payments of its ordinary and necessary business expenses. Petitioner claimed a partnership loss in 1981 of $190,970, representing his distributive share of the ordinary loss claimed by Brooke Associates for 1981. Respondent disallowed petitioner's deduction.

The motion picture generated gross receipts of $24,307,646 as of March 31, 1985, and $25,054,240 as of June 30, 1986.

OPINION

Respondent's primary position is that petitioner was not at risk in 1981 to the extent of the entire amount of $257,058 and that the amount must be discounted accordingly. In the alternative, respondent maintains that the principal amount of the recourse purchase note must be discounted because nonrecourse interest is "contingent

interest" in accordance with the regulations under section 483. Petitioner disputes both positions.

## I. *At-Risk Issue*

An individual taxpayer engaged in the activity of holding, producing, or distributing a motion picture film is allowed to deduct losses from the activity only to the extent the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1)(A) and (c)(1)(A). Included in the amount for which a taxpayer is considered at risk are cash contributions and certain amounts borrowed with respect to the activity. Sec. 465(b)(1). These provisions also apply to partners and partnerships. *Peters v. Commissioner,* 77 T.C. 1158, 1163 (1981).

Amounts borrowed for which the taxpayer is considered at risk include amounts borrowed for use in the activity to the extent to which the taxpayer is personally liable for repayment. Sec. 465(b)(2)(A). A taxpayer shall not be considered at risk, however, with respect to any amounts protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4).

The parties agree that the general objective of section 465 is to ensure that a taxpayer deducts losses with respect to certain activities only inasmuch as he is economically or actually at risk for the investment. The legislative history of section 465 confirms this analysis:

The committee believes that it is not equitable to allow these individual investors to defer tax on income from other sources through losses generated by tax sheltering activities, to the extent the losses exceed the amount of actual investment the taxpayer has placed at risk in the transaction. [S. Rept. 94-938, at 47 (1976), 1976-3 C.B. (Vol. 3) 85.]

In *Melvin v. Commissioner,* 88 T.C. 63, 75 (1987), we recently stated,

The relevant question is who, if anyone, will ultimately be obligated to pay the partnership's recourse obligations if the partnership is unable to do so. It is not relevant that the partnership may be able to do so. The scenario that controls is the worst-case scenario, not the best case. * * * The critical inquiry should be who is the obligor of last resort, and in determining who has the ultimate economic responsibility for the loan, the substance of the transaction controls. *United States v. Raphan,* [759

F.2d 879 (Fed. Cir. 1985)] *supra* at 885. [Emphasis in original. Fn. ref. omitted.]

See also Nelson, "Recent Tax Court Decisions Construing the At-Risk Rules Provide Invaluable Guidance," 64 J. Tax. 362, 364 (June 1986).

In this case, however, the relevant question is not "who" would bear the ultimate obligation if the partnership were unable to do so. Petitioner executed the assumption agreement, and, applying the worst-case scenario, there is no question that petitioner (along with the other limited partners) would bear ultimate responsibility. The relevant question here is "to what extent" petitioner was at risk in 1981, i.e., what is the amount of the borrowing that he would have to pay in the event that the motion picture failed to generate revenues sufficient to pay off the $4,600,000 note.

Respondent acknowledges that the assumption agreement, by which petitioner undertook a direct liability to Ladd, created a personal liability for a borrowed amount. *Abramson v. Commissioner*, 86 T.C. 360, 375-376 (1986). Respondent argues that, because petitioner assumed primary obligation of the principal but not the interest on the note due in 10 years, petitioner's 1981 "borrowed amount" for purpose of section 465(b)(2) must be discounted to the present value of the principal amount assumed. Respondent contends that petitioner's assumption of the principal but not the interest of his portion of the recourse purchase note should not result in the same "borrowed amount" as if petitioner had assumed his share of both principal and interest. Respondent alternatively argues that the terms of the assumption agreement create an amount protected against loss under section 465(b)(4).

Petitioner maintains that his assumption of the $257,058 portion of the principal of the recourse purchase note represented an investment in the activity for which he was fully at risk at the close of the taxable year in issue. Petitioner argues that, absent a specific statutory directive, the application of a time value of money concept under section 465 must be rejected. As discussed below, we agree with petitioner.

*Section 465(b)(2)*

Preliminarily respondent suggests that petitioner's "borrowed amount" in 1981 may have been zero, i.e., that petitioner was not *currently liable* on his allocable portion of the recourse purchase note. Respondent so interprets the holding in *Pritchett v. Commissioner,* 85 T.C. 580 (1985), revd. and remanded 827 F.2d 644 (9th Cir. 1987).

As summarized in *Melvin v. Commissioner, supra:*

In *Pritchett,* limited partners made initial cash contributions to a partnership and agreed to make additional cash contributions in later years if called upon to do so by the general partners in order to repay a recourse loan extended to the partnership. We determined in *Pritchett* that the limited partners were not at risk with respect to their contingent cash call obligations. The loan did not accrue interest and no payments of principal were due on the loan for 15 years. See sec. 465(b)(3). In sum, the alleged recourse debt obligations of the limited partners to make additional cash contributions were not definite and fixed and were tainted by the non-arm's-length nature of the underlying partnership loan. * * * [88 T.C. at 74. Fn. ref. omitted.]

The instant case is thus distinguishable from *Pritchett.* The underlying partnership loan was executed at arm's length and, more importantly, petitioner's obligation under the assumption agreement was definite and fixed. Thus, petitioner was at risk with respect to the amount borrowed for which he was personally liable.

Respondent maintains that petitioner's "borrowed amount" is only the present value of the obligation assumed and that therefore the amount of $257,058 due in 1991 must be discounted to reflect 1981 dollars. Respondent argues that the time value of money concept is consistent with congressional intent behind section 465, consistent with the statutory framework already in place under section 465(b)(2)(B), and supported by *Pritchett v. Commissioner, supra.*

We have carefully reviewed respondent's cited authorities and arguments, as well as other sources; however, we find no requirement that one's "borrowed amount," as determined under the present statute, must take account of the time value of money.

Section 465(b)(2) provides as follows:

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

The statute does not allow for present value calculations, expressly or implicitly. Respondent's argument that the "net fair market value" language in section 465(b)(2)(B) establishes a "statutory framework" for present value calculations is not explained and is otherwise unsupported. That language is used solely with respect to pledged property and cannot be implied in the balance of the statute. The committee reports comprising the legislative history of section 465, as originally enacted and as subsequently amended, also fail to support respondent's position that a time value of money or fair market value of debt concept was intended by Congress. See, e.g., S. Rept. 94-938, at 45-51 (1976), 1976-3 C.B. (Vol. 3) 83-89; H. Rept. 95-1800 (1978), 1978-3 C.B. (Vol. 1) 521, 553-554; H. Rept. 98-861 (Conf.) (1984), 1984-8 C.B. (Vol. 2) 1, 374-376; S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1, 747-751.

As both parties recognize, the concept of the time value of money is found in the Internal Revenue Code. See, e.g., section 483, added by the Revenue Act of 1964, Pub. L. 88-272, 78 Stat. 19, 77-79; section 48(d)(6), added by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 808; and sections 1272 through 1275, also added by the Deficit Reduction Act of 1984, supra, 98 Stat. 532-543. The concept of the time value of money is, however, relatively new to the Code, whereas current deductions based on deferred obligations are routine in accrual situations. As demonstrated by these statutes, Congress has been explicit in the areas it has chosen to require present value calculations. Section 48(d)(6) extended at-risk rules to the investment tax credit passthrough provisions for certain leased properties under section 48(d). Although Congress expressly provided for present value computations in determining the at-risk percentage under section 48(d)(6)(C)(ii), it has not expressly so provided for determining amounts at risk under section 465.

We are unwilling to find an implied limitation of borrowed amount to present value in section 465, in part because of the absence of direction from Congress for determining the rate and manner for making present value computations. Respondent argues that the prime rate as of December 31, 1981, is the appropriate discount factor. This approach is not without logic. It was recently used, for example, in determining the fair market value of donated property in *Goldstein v. Commissioner,* 89 T.C. 535 (1987). See also *Waddell v. Commissioner,* 86 T.C. 848, 887, 910-912 (1986), on appeal (9th Cir., Jan. 20, 1987). In *Waddell,* a portion of a nonrecourse note was held to be bona fide indebtedness, the amount of which was computed under section 483, *infra,* and the pertinent regulations. 86 T.C. at 910-912. Similarly, present value computations were made in that case for purposes of comparing total economic benefits with total tax benefits over the life of the investment. 86 T.C. at 887.

Where fair market value is the issue presented and necessarily determined, the finder of fact may take into account all appropriate methods of reaching that value under the facts and circumstances of the particular case. We are presented here, however, with a question of whether fair market value is even relevant. If it is relevant, the appropriate discount rate logically could be determined in accordance with section 48(d)(6)(C)(ii), *supra,* or in accordance with section 1274(b)(2), as under section 483, *infra.*[2] The availability of such alternatives suggests that, in the context of the at-risk rules, the choice is better left to Congress.

Respondent submits that this Court's opinion in *Pritchett v. Commissioner, supra,* a Court-reviewed opinion, "indi-

[2]Sec. 48(d)(6)(C)(ii) provides in part:

For purposes of subclause (I), the present value shall be determined by using a discount rate equal to the underpayment rate in effect under section 6621 as of the time the lease is entered into.

Sec. 1274(b)(2) provides:

(2) DETERMINATION OF PRESENT VALUE.—For purposes of paragraph (1), the present value of a payment shall be determined in the manner provided by regulations prescribed by the Secretary—

    (A) as of the date of the sale or exchange, and

    (B) by using a discount rate equal to the applicable Federal rate, compounded semiannually.

See also sec. 1274(d)(1).

cates that discounting the obligation assumed to present value is the only way to effect the legislative intent of the at risk rules in situations involving long-term, non-interest-bearing obligations." Respondent asserts that nine judges "appeared to conclude" that were the taxpayers at risk, the amounts at risk should be discounted to present value.

Respondent's reliance focuses entirely on language in a concurring opinion, joined by three judges, and a dissenting opinion, joined by four judges.[3] These comments are not a holding by the Court. Nor do they directly state the proposition asserted by respondent. Because the Court held in *Pritchett* that the taxpayers were not at risk, we did not address the question of whether the non-interest-bearing notes should be discounted. Discussion of the time value of money concept was set forth only as supporting the analysis by the authors of separate opinions. Recognizing that the true economic value of an obligation is less than face value was an element of determining whether the obligation would be given effect at par or face value or whether the transaction had economic substance. Other considerations, however, must control whether the Court will recompute and substitute a value not set by independent parties to an arm's-length contract.

In reversing our decision in *Pritchett*, the Court of Appeals declined to address the Government's discounting argument, made there for the first time on appeal, because it had not been raised before us. The Court of Appeals noted that different evidence and arguments might have

---

[3]"SIMPSON, *J.*, concurring: * * *

\* \* \* \* \* \* \*

"At the outset, it should be pointed out that those notes do not bear interest. Although they purport to call for the payment of amounts ranging from $400,000 plus to $700,000 plus in 1992, they do not create a current obligation to pay such amounts. An obligation to pay $100 in 15 years without interest is currently worth only $23 if we assume that the customary interest rate for such an obligation is 10 percent. C. Nickerson, Accounting Handbook for Nonaccountants 575 (1975). Hence, at most, the notes represent a current obligation of less than 25 percent of the stated amounts. [85 T.C. at 591.]"

\* \* \* \* \* \* \*

"HAMBLEN, *J.*, dissenting: * * * The arrangement petitioners entered into appears to have substance, although the at-risk value of the Fairfield note is problematical. If so, as Judge Simpson's concurring opinion relates, then we should limit the at risk value of the Fairfield note rather than extend the at-risk provisions to situations where cash call requirements within the partnership agreement present additional economic risk to limited partners. [85 T.C. at 598.]"

been presented if this issue had been raised at trial. Similarly, different conclusions may be reached, as they are here, when an issue is presented directly, as it is here.

*Section 465(b)(4)*

· Section 465(b)(4) provides:

(4). EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

In *Melvin v. Commissioner, supra,* we commented on the above provision as follows:

Although the legislative history of section 465(b)(4) does not define specifically what is meant by the words "other similar arrangements," it does evidence concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss, even though the underlying transaction was not profitable. Those situations include nonrecourse financing, various insurance agreements, stop loss agreements, and other arrangements for compensation or reimbursement to the taxpayer for any loss he may suffer. *Porreca v. Commissioner,* 86 T.C. 821, 838 (1986).* * * [88 T.C. at 70-71.]

See also *Capek v. Commissioner,* 86 T.C. 14 (1986).

Respondent argues that, because of the deliberate exclusion of an interest component, the difference between $257,058 and the present value (as of 1981) of that amount is essentially an amount protected against loss under section 465(b)(4). The examples given of arrangements or agreements referred to in section 465(b)(4), although not exhaustive, are not comparable. Here, petitioner had no available protection, compensation, or reimbursement of the principal amount. Respondent's proposed extension of section 465(b)(4) to these circumstances is merely another implication of present value computations unwarranted by the statute. We therefore hold that petitioner's borrowed amount, for purposes of computing his amount at risk, in 1981 was $257,058.

## II. *Contingent Interest Issue*

In a stipulation of settled issues, the parties agreed to the following:

The amount of the Recourse Purchase Note included in the tax basis of the Motion Picture "Body Heat" acquired by Brooke Associates is $4,600,000, except as may be decreased by the application of I.R.C. sec. 483, which is an issue to be determined by the Court.

This issue has tax effect only upon our determination, as set forth above, that petitioner is at risk for his share of the $4,600,000 note. All other issues raised in the statutory notice have been settled. It is not contended by respondent, for example, that the assumption agreement executed by petitioner is itself subject to section 483.

In the case of certain deferred payment contracts, section 483 generally provides that a portion of the payments must be treated as interest, whether or not so designated. The amount of each payment that must be treated as interest is determined, under section 483(a), as follows:

$$\text{Payment} \ \times \ \frac{\text{Total unstated interest}}{\substack{\text{Total of payments due to} \\ \text{which the section applies}}}$$

Total unstated interest is determined under section 483(b) as follows:

$$\frac{\substack{\text{Total payments due to which the section applies} \\ - \ \text{Total of present values of such payments and the} \\ \text{present values of any interest payment due}}}{\text{Total unstated interest}}$$

The rate and manner for making present value computations are provided in the regulations prescribed by the Secretary.

Total unstated interest generally exists if there is no interest or insufficient interest set forth in the instrument. Insufficient interest means that the contract rate of interest is less than the applicable prescribed test rate. See sec. 1.483-1(d)(1), Income Tax Regs. The prescribed test rate applicable in this case is 9-percent-per-annum simple interest. Sec. 1.483-1(d)(1)(ii)(C), Income Tax Regs.

Not all amounts or rates of interest described in deferred payment contracts are considered for purposes of section 483. If the provisions for the payment of interest are indefinite as to time, liability, or amount, or if the contract provides for contingent interest, the amount shall not be

considered for purposes of section 483 until the payments are actually made. Sec. 1.483-1(e)(1) and (2), Income Tax Regs. Contingent interest is described in the regulation as follows:

contingent interest shall not be taken into account in determining whether there is total unstated interest under the contract. For purposes of section 483, interest shall be considered as contingent if the liability for, or the amount or due date of, such interest cannot be determined at the time of the sale or exchange. If any part of the interest provided for in the contract is not contingent interest, such part shall be taken into account as stated interest for purposes of section 483. * * * If the contract provides that all or a definite part of the interest must in all events be paid by a date specified in the contract (whether or not in certain circumstances it must be paid earlier), then such interest (or the definite part thereof) shall not be considered contingent interest and shall be taken into account as stated interest due on such specified date. * * * [Sec. 1.483-1(e)(2).]

Petitioner maintains that section 483 does not require any discounting of the recourse purchase note because (1) the note bore interest at the rate of 9 percent per annum, the same as the prescribed test rate, and (2) the interest is payable in all events on January 10, 1991, unless paid earlier under the mandatory prepayment provisions. Petitioner thus argues that the interest on the recourse purchase note may be taken into account for determining if there is unstated interest and that therefore there is no unstated interest.

Respondent, however, maintains that the interest on the recourse payment note may not be considered stated interest for purposes of determining if there is unstated interest. Respondent argues that because the interest liability on the recourse purchase note is nonrecourse and payable solely from gross receipts, the extent to which interest payments will be made is dependent upon the gross receipts generated. Accordingly, respondent argues, the interest payments constitute contingent interest because the amounts of, and due dates of, the payments cannot be ascertained. Respondent would thus discount the amount of the recourse purchase note assumed by petitioner and thereby reduce the amount of petitioner's basis in the partnership under section 752.

Respondent relies on *Caruth v. United States,* 566 F.2d 901 (5th Cir. 1978), and Rev. Rul. 82-224, 1982-2 C.B. 5. The Revenue Ruling is not authority; it is merely the position of one of the parties before us. See *Stark v. Commissioner,* 86 T.C. 243, 250-251 (1986). *Caruth* and the Revenue Ruling involved non-interest-bearing notes. In *Caruth,* the court applied section 483 because it determined that the payments due on the note were indefinite. It did not consider nonrecourse interest or the applicability of section 483 to a recourse note bearing nonrecourse interest. Respondent has cited no authority for the proposition that section 483 applies solely because the interest due on a note is nonrecourse.

Based on the facts of this case, we conclude that petitioner's portion of the recourse purchase note bearing nonrecourse interest is not required to be discounted pursuant to section 483. The recourse or nonrecourse nature of interest alone does not determine whether interest is contingent interest. Instead, the Court must determine "if the liability for, or the amount or due date of, such interest [can or] cannot be determined at the time of the sale or exchange." Sec. 1.483-1(e)(2), Income Tax Regs. Applying the described test to the facts of this case, we conclude that the interest on the recourse purchase note is not contingent interest. The rate of interest was 9 percent per annum, and payment is due on January 10, 1991, unless paid earlier pursuant to the mandatory prepayment provisions.

We frequently disregard nonrecourse debt when it is given as part payment of a purchase price far in excess of fair market value and is thus not likely to be paid. See cases cited and analysis in *Estate of Baron · v. Commissioner,* 83 T.C. 542, 548-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Although the interest was nonrecourse, there is no reason in this case to disregard that nonrecourse obligation. The parties stipulated that the purchase price was equal to the fair market value of the motion picture. The pre-release estimates of revenue and expense on the motion picture, the generally conservative nature of such estimates, and the confidence demonstrated by the Ladd Co. in such estimates sufficiently establish the likelihood of payment of the interest.

Respondent asserts that the motion picture would have no value on the due date of the notes because the usual useful life of a motion picture is 3 to 5 years. This assertion is a non sequitur and ignores the stipulated facts. There is no evidence to support respondent's argument that the obligors would probably default in payment of the interest.

Finally, conditions specified in the contract mandating early payment do not alter our conclusion. The regulation states that such conditions do not make the interest contingent. See sec. 1.483-1(e)(2), Income Tax Regs.

### III. *Section 6621(c) Issue*

Respondent argues that petitioner is liable for the increased rate of interest under section 6621(c) to the extent his underpayment is attributable to an adjustment of petitioner's amount at risk under section 465. Because we have held for petitioner on the at-risk issue, our inquiry need go no further.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, and WELLS, *JJ.,* agree with this opinion.