TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR DISTRIBUTORS, INC., HOLLYWOOD TOYOTA MOTOR, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Toyota Motor Sales, Inc. v. Commissioner
Docket No. 30242-81
United States Tax Court
T.C. Memo 1989-47; 1989 Tax Ct. Memo LEXIS 41; 56 T.C.M. (CCH) 1181; T.C.M. (RIA) 89047; January 31, 1989
*41 In calculating imputed interest pursuant to the 6-month rule of section 1.482-2(a)(3), Income Tax Regs., shipments of merchandise to a domestic importer ("taxpayer") by its foreign parent should be taken into account in strict chronological order and applied against the "earliest balance outstanding" of indebtedness, whether prepaid or deferred, unless treated otherwise on the taxpayer's books by agreement in accordance with regular trade practice. *42 James G. Phillipp and Robert A. Rizzi, for the petitioners. Martin D. Cohen, Richard G. Goldman and Robert J. Cuatto, for the respondent. CLAPP
MEMORANDUM OPINION CLAPP, Judge: The case is before the Court on petitioners' Motion for Summary Judgment pursuant to Rule 121. [1] The Commissioner determined the following deficiencies in petitioners' Federal income taxes: Taxable year
ended Sept. 30,
Deficiency
1972
$ 109,240
1973
758,003
$ 867,243
We must first decide whether there exists any genuine issue of material fact. If there does not, we must then decide whether petitioners are entitled to judgment as a matter of law, which depends on the correct order for taking into account items of indebtedness, both prepaid and deferred, and shipments of goods under the 6-month rule of section 1.482-2(a)(3), Income Tax Regs.
The parties have stipulated certain facts and these are so found and incorporated herein by this reference. All other *43 facts material to this motion have been conceded for purposes of this motion. Petitioner, Toyota Motor Sales, U.S.A., Inc. (TMS) is a California corporation formed in 1957 to serve as the exclusive importer into the continental United States of Toyota automobiles, light trucks and replacement parts. From the date of its incorporation and throughout its years in dispute, the capital stock of TMS was owned equally by two publicly held Japanese corporations, Toyota Motor Co., Ltd. (TMC) and Toyota Motor Sales Co., Ltd. (TMSJ), both of which were headquartered in Japan. TMC was at all relevant times one of the largest industrial corporations in Japan and the manufacturer of Toyota automobiles, trucks and various special motor vehicles. TMSJ was the world-wide distributor of Toyota products and purchased TMC's entire output of vehicles and parts, which were then resold by TMSJ to Toyota retail dealers in Japan and to Toyota importers overseas, such as TMS. All TMS purchases were directly from TMSJ and totaled approximately $ 650 million and $ 600 million, respectively, for the two taxable years in issue. As a corporation with substantially all of its operations based in Japan, TMSJ *44 set its wholesale prices for Toyota products to its dealers at home and importers overseas in Japanese yen. To better accommodate the majority of importers, however, TMSJ also published a supplemental price list denominated in both United States dollars and British pounds sterling, and these figures were determined by the price for such merchandise in yen, based upon the prevailing exchange rate. TMS at all times paid exclusively in dollars. As required by Japanese law, all Japanese exporters have been required to arrange for payment from their customers overseas strictly in accordance with one of the limited number of approved methods of settlement authorized under a series of rather elaborate currency regulations issued and enforced by the Japan Ministry of Finance. As applied to the transactions between TMS and TMSJ during the years in dispute, TMS could either pay TMSJ in advance of shipment or it could defer payment by instructing TMSJ to draw a bill of exchange payable by TMS not later than 6 months after the date of shipment and secured in the interim by an irrevocable letter of credit. Since its formation in 1957, with the exception of certain prepayments herein described, *45 TMS paid for all vehicles and service parts purchased from TMSJ on a deferred basis under an irrevocable letter of credit. TMS' purchases from TMSJ under letters of credit were effected in the following manner: Once or twice a month, TMS instructed one of its several banks in Los Angeles to open an irrevocable letter of credit in favor of TMSJ in an amount sufficient to cover TMS' maximum anticipated purchases of vehicles and service parts (typically $ 15 million to $ 25 million) during the next 2 to 4 weeks. Once the letter was issued, the Los Angeles bank so advised one of TMS' banks in Japan, which in turn notified TMSJ. Thereafter, whenever a ship carrying vehicles or service parts previously ordered by TMS was ready to sail from Japan, TMSJ delivered to its banks the invoices covering the merchandise purchased by TMS, together with a bill of lading confirming that the goods had actually been loaded on board the vessel. The bank in Japan then would mail these documents, accompanied by a bill of exchange drawn in dollars against TMS in favor of TMSJ, to the Los Angeles bank which had opened the letter of credit. Assuming the paperwork was in proper order when it arrived in Los *46 Angeles 7 to 10 days later, the Los Angeles bank wired payment from TMS' account to TMSJ's bank in Japan, where the funds were immediately converted from dollars into yen and deposited to TMSJ's general operating account at that bank. By early 1971, it had become evident that the dollar was overvalued in relation to most of the other currencies of the free world. It was also widely acknowledged in the international financial communities that the dollar should be worth fewer yen and would soon have to be devalued with respect to the yen. On May 10, 1971, two influential currencies, the German mark and the Dutch guilder, were permitted to float in the open market with the belief that given the free forces of supply and demand they would soon reach a realistic level of exchange. Both these currencies did, in fact, appreciate rapidly against the dollar, and imports into the United States priced in either currency soon became more expensive. In light of these developments, there was little doubt that Japan would act in the near future to revalue the yen. During the summer of 1971, pressure on the dollar by the yen continued, and the devaluation of the dollar against the yen appeared *47 increasingly certain. On August 15, 1971, President Nixon announced a 90-day "freeze" of wages, prices and rents, a suspension of dollar-gold convertibility and a customs surcharge on imports as set forth in Proclamation 4074, reprinted in the 1971 U.S. Code Cong. & Admin. News 2486-7. On August 28, 1971, the Japanese government allowed the yen to float, and the yen began to appreciate with respect to the dollar. By September 14, 1971, the yen-dollar exchange rate on the Tokyo interbank spot market had changed from 360 to the dollar to 338 to the dollar. By October 14, 1971, the rate had changed to 330 to the dollar. By November 15, 1971, the rate had changed to 328 to the dollar. By December 15, 1971, the rate was 322 yen to the dollar. In December 1971, in an attempt to establish a new international system of fixed exchange rates, the United States and its major trading partners met at the Smithsonian Institution in Washington, D.C. On December 17-18, 1971, a realignment of exchange rates for the currencies of the major industrial nations was agreed upon. The Smithsonian Agreement created new par values which resulted in a devaluation of the dollar against gold of 7.89 percent *48 and an upward revaluation of the yen against the dollar from 360 to the dollar to 308 to the dollar, a change of 16.88 percent. In addition, the Smithsonian Agreement permitted wider "margins" on either side of the new par values for permissible currency fluctuation. On December 20, 1971, the Japanese government fixed the official exchange rate of the yen in accordance with the Smithsonian Agreement at 308 yen (with a 2.25-percent margin) to the dollar. Also on December 20, 1971, the U.S. Government repealed the import surcharge imposed on August 15, 1971. Notwithstanding the Smithsonian Agreement, it was widely believed in early 1972 that the dollar would be devalued again. The yen increased in value from 308 to the dollar on December 20, 1971, to 304 to the dollar on February 15, 1972. The yen then increased in value to 302 to the dollar on March 15, 1972, and to 301 to the dollar on July 15, 1972. On February 13, 1973, the U.S. Government unilaterally devalued the dollar against all world currencies, including the yen, by 10 percent. Concurrently, the Japanese government allowed the yen to "float." By February 15, 1973, the value of the yen had increased to 271 to the dollar.
*49 In March 1973, the U.S. Government announced that the Federal Reserve Bank would no longer intervene in currency markets to stabilize the value of the dollar against other currencies, and the dollar was thereafter permitted to "float" against other currencies. In May 1971, TMS began to transfer dollars to TMSJ in the form of advance payments designed to cover a portion of its purchases from TMSJ in the period following the inevitable revaluation of the yen and the devaluation of the American dollar. During the period from May 12, 1971 through February 24, 1972 (hereinafter designated as the prepayment period), TMS made 19 payment transfers on 10 different dates to TMSJ, totaling $ 172 million as follows: Date of
Amount of
prepayment
prepayment
5-12-71
$ 10,000,000
5-13-71
7,500,000
5-13-71
2,500,000
5-13-71
3,000,000
5-13-71
7,000,000
8-19-71
16,000,000
8-23-71
10,000,000
8-24-71
6,000,000
8-27-71
10,000,000
1-10-72
20,000,000
1-26-72
5,000,000
2-14-72
10,000,000
2-24-72
10,000,000
2-24-72
15,000,000
2-24-72
7,500,000
2-24-72
10,000,000
2-24-72
10,000,000
2-24-72
7,500,000
2-24-72
5,000,000
[2] $ 172,000,000
*50 All of TMS' prepayments from and after May 12, 1971, were processed in an identical manner. As was required by the currency control regulations of the Japan Ministry of Finance, a formal certificate was issued for each transaction evidencing TMSJ's acceptance of the prepayment against the shipment within the next 12 months of equivalent value. The funds themselves were transferred by wire from TMS' bank in Los Angeles to one of TMSJ's banks in Japan and were there converted into yen at the prevailing rate of exchange on the spot market on the date of receipt and deposited into TMSJ's operating account. As transfers were made from TMS to TMSJ, they were credited by TMSJ on its books in favor of TMS for the future purchase of merchandise. For internal accounting purposes, TMSJ showed each prepayment on its own books as a liability owing to TMS. For purposes of TMS' own internal accounting, all prepayments were recorded on its books as a prepaid asset in an account captioned "Other Prepaid Expenses." At no time were prepayments from TMS ever placed in a segregated bank account or otherwise distinguished in any manner from the general assets of TMSJ. Solely for purposes of convenience, *51 the balance from time to time of prepayments made by TMS and credited as such by TMSJ are referred to hereafter as the "Prepayment Account." The prepayments were not evidenced by a promissory note or other written instrument requiring the payment of interest by TMSJ, and TMS in fact received no interest as such on any of its prepayments. The purchase orders issued by TMS to TMSJ did not specify whether payment for the merchandise covered by such purchase order was to be made from the so-called "Prepayment Account" or pursuant to a bill of exchange secured by a letter of credit. TMS had no definitive knowledge whether any particular shipment of merchandise ordered by TMS was in fact being charged by TMSJ against such "Prepayment Account" or was to be paid for pursuant to a bill of exchange secured by a letter of credit until TMS was notified by TMSJ, generally while the merchandise was already enroute to the United States. During the period May 1, 1971 to March 31, 1972, purchases by TMS were credited or paid for by both methods at random. Funds received by TMSJ in payment for merchandise shipped by TMSJ under letters of credit before the prepayment account had been fully charged *52 off on the books of TMSJ were commingled in TMSJ bank accounts with the remaining prepayment funds reflected in the balance of the prepayment account, and such letter of credit funds were in no way segregated from such prepayment funds. Prior to the end of August 1971, prepayments to Japanese exporters were made by a number of importers throughout the world, and the inflow of advanced export receipts into Japan reached a peak during that month at $ 2,900,000,000. The deficiency determination for the years in issue represent the tax on interest income imputed by the Commissioner to TMS with respect to the $ 172 million of prepayments made by TMS to TMSJ during the period from May 12, 1971 to February 24, 1972. In each instance, the determination is based on section 482 [3] which authorizes the Commissioner in certain circumstances to reallocate income and deductions between two corporations controlled by the same persons, [4] see section 1.482-2(a)(1), and in particular section 1.482-2(a)(3), Income Tax Regs., applicable to the years at issue and dealing with the extension of credit between such related corporations at less than an arm's-length rate of interest. Section 1.482-2(a)(3), *53 Income Tax Regs., reads as follows: (3) Loans or advances to which subparagraph (1) applies. Subparagraph (1) of this paragraph applies to all forms of bona fide indebtedness and includes: (i) Loans or advances of money or other consideration (whether or not evidenced by a written instrument), and (ii) Indebtedness arising in the ordinary course of business out of sales, leases, or the rendition of services by or between members of the group, or any other similar extension of credit. *54 Subparagraph (1) of this paragraph does not apply to alleged indebtedness which was in fact a contribution of capital or a distribution by a corporation with respect to its shares. The interest period shall commence at the date the indebtedness arises, except that with respect to indebtedness described in subdivision (ii) of this subparagraph that is not evidenced by a written instrument requiring payment of interest, the interest period shall not commence until a date 6 months after the date the indebtedness arises, or until a later date if the taxpayer is able to demonstrate that either it or others in the industry, as a regular trade practice, permit comparable balances in the case of similar transactions with unrelated parties to remain outstanding for a longer period without charging interest. For the purpose of determining the period of time for which a balance is outstanding, payments or credits shall be applied against the earliest balance outstanding, unless the taxpayer applies such payments or credits in some other order on its books in accordance with an agreement or understanding of the parties if the taxpayer can demonstrate that either it or others in its industry, *55 as a regular trade practice, enter into such agreements or understandings.[Section 1.482-2(a)(3), Income Tax Regs.; Emphasis added.] Pursuant to a prior order of this Court, [5] the parties are limited to a computation of imputed interest under section 1.482-2(a)(3)(ii), Income Tax Regs., involving indebtedness arising in the ordinary course of business. Under section 1.482-2(a)(3), Income Tax Regs., imputed interest does not begin to run on any item of subdivision (ii) indebtedness "until a date 6 months after the date" on which the indebtedness arose, with exceptions not applicable here. Only when the indebtedness has not been repaid or otherwise discharged within this 6-month period does section 482 first become an issue. From that time forward, the creditor must either charge interest on the unpaid balance or be prepared to have interest income imputed to his account for tax purposes. *56 With this background, we first consider respondent's contention that petitioners' Motion for Summary Judgment must be denied because certain material facts necessary to determine the ultimate issue are in dispute. A motion for summary judgment will be granted if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 121(b). The burden of proving there is no genuine issue of fact is on the moving party, Matut v. Commissioner,86 T.C. 686, 689 (1986), and the factual inferences before the Court must be viewed in a light most favorable to the party opposing the motion. Matut v. Commissioner, supra at 686. Respondent in essence contends that petitioners include several unsupported statements in their brief in support of their motion which are material to the outcome of the section 482 issue. Excerpts cited by respondent include: (A) Determined to protect itself to the best of its ability under the circumstances, TMS set out at once to transfer as many dollars as possible to TMSJ in the form of advance payments designed to cover some small portion of its purchases from TMSJ in the *57 period following the inevitable revaluation of the yen and after TMSJ had been forced to revise its supplemental price list to account for a less favorable rate of exchange in terms of the American dollar. (B) Japanese currency-control regulations made it difficult, if not impossible, for nonresidents to own yen-denominated bank accounts in any substantial amount. See, e.g., Ministry of Finance Bureau of International Finance Circular No. 4743 of 1971 under Cabinet Order Concerning Nonresident Free Yen Accounts (Cabinet Order No. 157 of 1960). (C) For its own part, TMS felt the time was right to make more prepayments, and between January 10 and February 24, 1972, transferred another $ 100,000,000 to TMSJ by way of additional advance payments in anticipation of yet another significant revaluation of the yen. (D) As it turned out, TMS' assessment of the situation was essentially accurate, although its timing was in some respects a bit premature. (E) From the standpoint of prudent financial planning, TMS' prepayments were an unqualified success. Respondent continues that to the extent these statements suggest, imply, or purport to assert as fact "(1) that TMS initiated, originated *58 or proposed the idea or plan for its prepayments to TMSJ, or (2) that such prepayments were designed or intended to benefit TMS rather than TMSJ, such statements are wholly without support from either of the parties' stipulation of facts." That being the case a review of the facts highlights that "TMSJ, the parent, and not, TMS, the controlled subsidiary initiated the prepayment plan, under which the parent stood to make large profits by obtaining interest-free advances from its subsidiary and by using such dollars to buy yen prior to the anticipated and eventual sharp decline in the dollar's value." Moreover, respondent notes the absence of "contracts, agreements, resolutions, corporate minutes, correspondence, directives or other writings" which would evidence either TMS or TMSJ's motives or intentions, and of the rules, standards, and criteria governing the application of the prepayment funds. Thus, the "cloud" of doubt surrounding the switch to prepayment from letter of credit makes it impossible to decide the ultimate issue of law. We disagree. Petitioners have conceded for the limited purpose of their motion that respondent's statutory notice is valid and correct in every *59 respect except insofar as it fails to give effect to the final sentence of section 1.482-2(a)(3), Income Tax Regs.[6] In this regard, all underlying facts contained in the record are viewed in a light most favorable to respondent, the party opposing the motion for summary judgment. To reach our conclusion in the instant case, we need only establish (1) that there were loans or advances of money or other consideration, (2) that the TMS prepayments arose in the ordinary course of business within the meaning of that regulation, and finally, with this knowledge, (3) the ultimate issue of the correct way to determine the period of time for which a balance is outstanding pursuant to section 1.482-2(a)(3), Income Tax Regs.
The stipulation of facts clearly establishes the first point. The prior order of this Court concluded that the TMS prepayments arose in the ordinary course of business with the result that section 1.482-2(a)(3)(ii), *60 Income Tax Regs., applied. We are able to consider the ultimate issue because the arguments set forth by respondent alleging disputed facts do not provide a basis for denying petitioners' motion. The facts on which respondent disagrees with petitioners all go to whether or not TMS and TMSJ had a separate undisclosed agreement. While respondent would like us to find that these "disputed facts" point to an undisclosed prepayment agreement between TMS and TMSJ, the existence or nonexistence of such an agreement is irrelevant. The important fact is that the loans or advances were made and that has been stipulated. Which party may have instigated the prepayments is also irrelevant. Furthermore, respondent, as petitioner points out, "neglects to mention * * * that more than two years ago he was provided with a copy * * * of all such correspondence of which petitioners have any knowledge." Additionally, the stipulation between the parties indicates that either form of payment was acceptable under Japanese law, such that an advance agreement or understanding between the parties would not be necessary in order for TMS to alter its method of payment to TMSJ. Respondent's basis for *61 imputing interest income under section 482 is based on the prepayment account entries on the books of TMSJ, which are not in dispute. We therefore conclude that there is no genuine issue of material fact and are able to proceed to the question of law before us. The parties disagree over the correct method for determining the length of time the indebtedness created by individual prepayments and deferred payments remained outstanding for purposes of section 1.482-2(a)(3), Income Tax Regs. Petitioners argue first that respondent's utilization of TMSJ's book entries to determine TMS' potential imputed interest is prohibited under the regulations, which require that the taxpayer produce its own books to fit within the exceptions. Additionally, petitioners argue that absent the use of the book entries exception, section 1.482-2(a)(3), Income Tax Regs., clearly requires that all the shipments of merchandise from TMSJ to TMS be taken into account in strict chronological order and that credits should be applied against the "earliest balance outstanding" of indebtedness pursuant to the regulation. Petitioners contend that the fact that the book balance in the account has been outstanding *62 and constant or increasing in amount longer than 6 months is of no consequence if none of the individual items of indebtedness included in that balance on any given date taken in strict chronological order has itself been outstanding for more than 6 months. They contend that the only exception to this regulation arises where the corporation has in fact applied payments or credits in a different order in its own books in accordance with a specific agreement or understanding with the other party to the transaction, and then only if that party can demonstrate that this is a regular trade practice. In the instant case, petitioners are not trying to prove the existence of a contract or agreement or understanding between TMS and TMSJ or trying to establish that this agreement or understanding is consistent with past practice or the custom in the industry. Thus, petitioners assert that they fall under the general rule which requires in plain language that every payment by or credit is conclusively presumed to have been applied against whichever item of indebtedness on the date of the payment or credit had been outstanding for the longest time. Respondent does not agree that one should *63 take into account TMSJ's shipments in the strict chronological order and contends rather that only the comparatively few shipments which were formally charged off against the prepayment account on the books of TMSJ may properly be applied to the indebtedness created by the prepayments originally reported in the account. Respondent views interest as accruing on the earliest of TMS' prepayments if and to the extent that an amount equal to the early prepayments, in the aggregate, continued to be reflected in the prepayment account balances on the books of TMSJ. Thus, respondent looks to the fact that during the 6-month period following each of TMS' 19 prepayments, TMSJ charged only certain selected purchases to the prepayment account on its books, and even after TMS began making prepayments, TMSJ continued to treat most of its subsequent shipments to TMS as deferred payment sales. Petitioners admit that only those shipments debited to the prepayment account affected the book balance of the account. Petitioners counter, however, that respondent's argument ignores the substance of the transaction in favor of TMSJ's bookkeeping entries. Petitioners do not deny that the prepayment account *64 was properly classified as a liability on the balance sheet of TMSJ. Petitioners do not believe that the accuracy of TMSJ's balance sheet is the issue, but that the relevant question under section 1.482-2(a)(3), Income Tax Regs., is whether the balance in the account at the end of each month consisted of the very same items of indebtedness created by TMS' prior prepayments, as distinguished from more recent items of indebtedness arising as a result of numerous intervening transactions between TMS and TMSJ settled on a deferred-payment basis. Petitioners recognize, however, that every shipment not charged to the prepayment account gave rise to a short-term receivable in favor of TMSJ. Petitioners also contend that, for purposes of section 1.482-2(a)(3), Income Tax Regs., this receivable offset and reduced the oldest individual component of whatever indebtedness attributable to TMS' prior prepayments was still outstanding on the date of shipment. Although the payment of the bill of exchange a week to 10 days later restored TMSJ's total book indebtedness to TMS to its previous level just before the shipment, the payment also created an entirely new item of indebtedness on which the *65 6-month computation period of section 1.482-2(a)(3), Income Tax Regs., began to run only from the date of the payment. Under petitioners' interpretation of section 1.482-2(a)(3), Income Tax Regs., therefore, no interest income is properly imputed to TMS with respect to any of its 19 prepayments as long as (1) during the 6 months immediately following each prepayment TMSJ shipped merchandise to TMS equal in value to the prepayment and (2) during the 6 months immediately following each payment received by TMSJ on an earlier deferred-payment transaction, TMSJ shipped additional merchandise to TMS at least equal in value to the amount of that particular payment. Petitioners contend that the stipulated facts point out that this was indeed the case. We agree with petitioners' analysis of section 1.482-2(a)(3), Income Tax Regs. By its very terms, section 1.482-2(a)(3), Income Tax Regs., only provides an exception where the corporation with respect to which the Commissioner proposes to make a section 482 adjustment has in fact applied payments or credits in "some other order on its books in accordance with an agreement or understanding of the parties." Section 1.482-2(a)(3), Income Tax *66 Regs., is clear that only the taxpayer whose liability is in dispute is entitled to rely on its book entries to establish the sequence in which payments or credits are to applied against the various individual items of indebtedness included in the balance of the intercompany account. Even then, the taxpayer is strictly limited to the entries in its own books, and must be prepared to prove that those books were kept in accordance with a specific agreement or understanding between the two companies reflecting their own past practice or the accepted custom in the industry. We do not have such a situation in this case. Respondent's proposed assessments are based entirely on the history of the application of TMS' prepayments as described in TMSJ's books and records. TMSJ's books and records, under the facts of the case, can not be of any relevance in determining which shipments offset which prepayments. Respondent's argument, moreover, ignores the substance of the transaction in dispute in favor of TMSJ's bookkeeping entries. Under this theory, TMS' tax liability is no longer in any respect a function of the economic substance of its transactions with TMSJ but depends entirely on *67 the method by which TMSJ chose to record those transactions on its own books. As petitioner points out, petitioners' liability should be made dependent on a matter of greater substantive significance than the choice of an accounting procedure on the part of a third party in a foreign jurisdiction. Having determined that TMSJ's books should not determine the sequence in which payments or credits are to be applied against the various individual items of indebtedness, we next address respondent's argument which questions petitioners' dual forms of payments and specifically payment by letter of credit. This argument is based upon a technical advice memorandum prepared by the national office and which was published shortly before the statutory notice was issued. Respondent cites the relevant portion of the memorandum in his answering brief: It is axiomatic that delivery of goods for which payment is actually received by letter of credit transaction does not create any indebtedness between the buyer and seller of such goods because, assuming no irregularities transpire in any of the relevant transactions, the purchase and sale is complete and payment for the goods has occurred. Since *68 no indebtedness is created by such a transaction, section 1.482-2(a) has no application with respect to it. In this context, delivery of goods for which payment is actually received by letter of credit transaction will not enter into the calculation of the outstanding balance of indebtedness created in other transactions because no indebtedness has arisen with respect to those goods to bring their delivery within the ambit of section 1.482-2(a). Therefore, for purposes of determining, in accordance with section 1.482-2(a)(3)(ii), the period of time for which the balance of any prepayment described above was outstanding, payments or credits required to be applied against the earliest balance outstanding do not include Corp. C's purchase of product y from Corp. B to the extent that such purchases were paid for by letter of credit transactions. The technical advice memorandum does not deal with our actual facts and therefore lacks any persuasive value. [7] Respondent's argument is predicated on the notion that whenever TMS purchased merchandise from TMSJ under a letter of credit, payment for the merchandise was actually received by the letter of credit. In the technical advice *69 memorandum, payments for the goods occurred at the time of shipment and the goods themselves never entered into the calculation of the outstanding balance of indebtedness attributable to any earlier prepayment "because no indebtedness has arisen with respect to those goods to bring their delivery within the ambit of section 1.482-2(a)." Implicit in respondent's analysis is the unspoken but essential assumption that each letter of credit opened by TMS, not unlike a certified check, constituted present payment to TMSJ, and, therefore, the sale of merchandise to TMS under a letter of credit created no indebtedness owing from TMS to TMSJ. This is not the facts we have before us presently. In the instant case, the letter of credit was merely a security device designed to ensure payment at some date in the future. What it secured in the interim was nothing more than an ordinary bill of exchange for the purchase price of the merchandise ordered by TMS. The bill of exchange was sent from Japan to Los Angeles where, within a week to 10 days after the goods had been shipped, TMSJ was paid, not by demand on the issuing bank to honor its letter of credit but by a routine wire transfer of funds *70 already on deposit in TMS' commercial account in the United States. While the letter of credit undoubtedly gave TMSJ comfort that the debt would be paid, it did not equal a present payment for the value of the goods in transit. The Internal Revenue Service recently revised and republished section 1.482-2(a), Income Tax Regs., dealing with the imputation of interest on intercompany loans or advances between interrelated parties meeting the common ownership test of section 482 of the Code. See T.D. 8204, 1988-24 I.R.B. 11, 12. While the new regulations are only effective for indebtedness arising after June 30, 1988, they are nevertheless helpful in that they clearly articulate the use of a first-in first-out (FIFO) order. Under these new regulations, the rule of the last sentence of old section 1.482-2(a)(3), Income Tax Regs., generally requiring the use of a first-in first-out (FIFO) computation for determining the application of payments or credits against intercompany *71 indebtedness, has been retained in new section 1.482-2(a)(1)(iv)(A), Income Tax Regs. New section 1.482-2(a)(1)(iv)(A), Income Tax Regs., states that "in determining the period of time for which an amount owed by one member of the group to another is outstanding, payments or other credits to an account are considered to be applied against the earliest amount outstanding, that is, payments or credits are applied against amounts in a first-in, first-out order." (Emphasis added.) We find that the shipments of merchandise should be taken into account in strict chronological order and should be applied against the "earliest balance outstanding" of indebtedness whether arising from prepayments or deferred payments. For the foregoing reasons, petitioners' Motion for Summary Judgment is granted. An appropriate order will be entered.
Footnotes
1. All section references are to the Internal Revenue Code, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In addition to and after the close of the prepayment period on February 26, 1973, March 19, 1973 and July 2, 1973, TMS made several additional prepayments to TMSJ in the aggregate amount of $ 15 million. Of this total amount, $ 14,807,388 was liquidated on TMSJ's books within 6 months following the prepayment date against the shipment of merchandise by TMSJ to TMS, and the balance ($ 192,612) was so liquidated within 7 months of the prepayment date. The portion of the total deficiency in issue attributable to these $ 15 million of prepayments, as set forth in the statutory notice, is less than $ 400. These $ 15 million of prepayments are no longer at issue in these proceedings.↩
3. Section 482 reads as follows: SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible. ↩
4. Solely for the limited purpose of this motion, petitioners concede that respondent's statutory notice is factually valid and correct, and, therefore, that TMS was a corporation controlled by TMSJ within the meaning of section 482 during both of the taxable years in question and that each of the 19 prepayments in issue gave rise to intercompany indebtedness of the type on which interest would have been paid to TMS had the prepayment been made by TMS on an "arm's length basis" to an unrelated third party under comparable circumstances.↩
5. During the years at issue, TMS made prepayments to its parent company in Japan which were applied in payment for later shipments of merchandise. No interest was paid by the parent company with respect to these prepayments. Respondent determined under section 482 that interest should be attributed to TMS. Prior to this motion, the Internal Revenue Service Appeals level considered whether the prepayments represented "loans or advances" of money or other consideration of the type described in section 1.482-2(a)(3)(i), Income Tax Regs., or "indebtedness arising in the ordinary course of business out of sales" as described in section 1.482-2(a)(3)(ii), Income Tax Regs. The significance of the difference is that under subdivision (ii), interest does not start to accrue until 6 months after the date of the prepayment, whereas under subdivision (i), interest commences immediately. Interest of approximately $ 5.2 million arises under subdivision (i) versus $ 1.8 million of attributed interest to TMS under subdivision (ii), assuming respondent were to prevail in his argument in this summary judgment action. The national office of the Internal Revenue Service on October 24, 1980, issued a technical advice memorandum at the request of TMS. That memorandum held that the prepayments fell under subdivision (ii) with the result that the so-called "6-month rule" applied. A published revenue ruling was released shortly thereafter on substantially the same facts which reached the same conclusion. See Rev. Rul. 82-235, 1982-2 C.B. 104↩. The technical advice memorandum issued to TMS also dealt with the manner and timing of the offsetting of sales against the prepayments. The technical advice memorandum did not decide the issue favorably to TMS, with the result that many more sales fell outside the "6-month rule" and a substantial amount of interest, i.e., $ 1.8 million was attributed to TMS. The Appeals Office issued a notice of deficiency to TMS based on the conclusions set forth in the technical advice memorandum. On December 15, 1981, TMS filed a petition with this Court challenging the manner and timing of the offsetting sales and how long the prepayments remained outstanding. TMS agreed with the technical advice view that the prepayments created "indebtedness arising in the ordinary course of business out of sales" with the meaning of subdivision (ii) as that had always been TMS' position on this question. Respondent filed his answer on February 2, 1982. In late 1983, the Court requested a trial status report and respondent's trial counsel replied that the case was ready. Sometime thereafter, respondent's trial counsel advised petitioners that he believed that the technical advice memorandum reached the wrong conclusion with respect to the classification of the prepayments and that they should have been classified under subdivision (i) so that the "6-month rule" would not apply. On June 13, 1984, respondent's trial counsel informed petitioners that he had decided to request reconsideration of the technical advice memorandum. Eight months later on January 15, 1985, having heard nothing from the national office, petitioners filed a Motion for Summary Judgment based on respondent's determination that the "6-month rule" applied and arguing the sole question of the offsetting of sales, the issue which is currently before us. On February 8, 1985, respondent's trial counsel submitted a request to the Internal Revenue Service's national office for reconsideration of the technical advice memorandum, following which the national office concluded not to revoke the technical advice which was still outstanding as the Internal Revenue's official position on this issue. Despite this, respondent's trial counsel proceeded to prepare and file on July 31, 1985, a Motion for Leave to File an Amended Answer which raised the question concerning whether subdivision (i) of the section 482 regulation should apply. This motion was denied on May 9, 1986, by this Court since it was determined that petitioners would be prejudiced by granting the motion which would have reopened an issue already thoroughly considered and decided by respondent's national office in favor of petitioners.
6. It is not unusual for a party to concede a factual issue for purposes of a motion for summary judgment and reserve the issue for a factual determination in the event the motion is denied. See McLain v. Commissioner,67 T.C. 775, 778-779↩ (1977).
7. A technical advice memorandum is not, of course, authority but rather only the position of one of the parties before us. Follender v. Commissioner,89 T.C. 943, 958↩ (1987).