# United States Tax Court

T.C. Memo. 2023-74

ANTHONY J.A. BRYAN, JR.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 16797-16.                    Filed June 20, 2023.

————————

Anthony J.A. Bryan, Jr., pro se.

*S. Penina Shadrooz* and *Sarah A. Herson*, for respondent.

## MEMORANDUM OPINION

KERRIGAN, *Chief Judge*: Respondent determined the following income tax deficiencies, additions to tax, and accuracy-related penalties:[1]

| Year | Deficiency | Additions to Tax / Penalties | |
|---|---|---|---|
| | | *§ 6651(a)(1)* | *§ 6662(a)* |
| 2010 | $46,539 | $11,635 | $9,308 |
| 2011 | 41,128 | 5,511 | 8,226 |
| 2012 | 150,237 | 35,425 | 30,047 |

The determinations for 2010 and 2011 were made in a deficiency notice issued to petitioner (Anthony J.A. Bryan, Jr., a.k.a. Anthony

———————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*2] Bryan, Jr., John A. Bryan, or John Bryan, Jr.) and his wife (Ms. Bryan) and stem from their joint federal income tax returns for those years. The determinations for 2012 were made in a deficiency notice issued to petitioner only and stem from his separate federal income tax return for that year. Petitioner petitioned the Court to redetermine the determinations for all three years (subject years). Ms. Bryan did not join in his Petition for 2010 and 2011.

Following concessions, we are left to consider two issues for each subject year.[2] First, we decide whether petitioner may deduct the net operating loss (NOL) carryover that was claimed on his tax return. We hold he may not. Second, we decide whether petitioner is liable for the section 6651(a)(1) addition to tax that respondent determined. We hold he is.

## *Background*

### I. *Background*

This case is before the Court fully stipulated under Rule 122. The stipulated facts and facts drawn from the stipulated exhibits are incorporated herein by this reference. Petitioner resided in California when he timely filed his Petition.

Petitioner and Ms. Bryan were married throughout the subject years, and they filed joint federal income tax returns for 2010 and 2011.[3]

---

[2] Petitioner in his Amended Opening Brief also addresses a third issue: whether the Court should sustain the section 6662(a) accuracy-related penalties. The parties have stipulated that "[p]etitioner is liable for the accuracy-related penalty under I.R.C. § 6662 for 2010 and 2011 only as to the portion of the deficiency arising from the disallowed Schedule A home mortgage interest deductions," that "[p]etitioner is not liable for the accuracy-related penalty under I.R.C. § 6662 as to the remaining issues for 2010 and 2011," and that "[p]etitioner is not liable for the accuracy-related penalty under I.R.C. § 6662 for 2012." Those stipulations resolve any dispute that the parties may have had as to the applicability of the section 6662 accuracy-related penalties and are binding on the parties unless we conclude that justice requires otherwise. *See* Rule 91(e); *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1547 (9th Cir. 1987), *aff'g* T.C. Memo. 1986-23. We do not conclude that justice requires otherwise and will apply those stipulations without further discussion.

[3] Ms. Bryan was granted innocent spouse relief pursuant to section 6015 for the deficiencies, penalties, and additions to tax in the notice of deficiency for 2010 and 2011.

[*3] Petitioner filed a separate federal income tax return for 2012, using the filing status of married filing separately.

II.    *Watley Group, LLC*

The Watley Group, LLC (Watley), is a California limited liability company formed on February 27, 1996. From January 1, 2007, through December 31, 2012, petitioner owned a 99% membership interest in Watley, and Ms. Bryan owned the remaining 1% interest.[4] Watley's operating agreement does not state that its members are liable for Watley's debts, and it does not provide for mandatory cash calls by or to its managers or members. Watley's operating agreement does not provide for a capital deficit restoration obligation.

Watley's operating agreement does not require its members to contribute additional capital to Watley in excess of the "Maximum Capital Contribution" listed in the operating agreement. Watley members must make their maximum capital contribution upon receipt of a notice of request from a "majority in interest" of Watley's members. Petitioner owned a "majority in interest" in Watley from January 1, 2007, through December 31, 2012. Maximum Capital Contribution amounts, when requested by the "majority in interest," are paid in installments "determined exclusively by the Managers, in their reasonable discretion as needed for [Watley's] business." The operating agreement lists petitioner's Maximum Capital Contribution as $166,667. The record does not show whether he has ever made that contribution.

Petitioner gave Watley a purported promissory note (petitioner's $2.7 million note), dated September 30, 2007, stating that he would pay $2.7 million to Watley on or before December 31, 2030, with interest accruing at an annual rate of 4.75%. The note is neither secured nor

---

[4] Neither party contends that any of Watley's taxable years herein is subject to the audit procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). *See* §§ 6221–6234 (as in effect for years before 2018). Watley qualified for small partnership status under section 6231(a)(1)(B) for each of those years and checked a box on its 2008 through 2011 partnership returns indicating that it was not electing to have the TEFRA provisions apply. Therefore, Watley is not subject to the TEFRA provisions, and we proceed accordingly.

[*4] collateralized.[5] The note does not include a repayment schedule but does allow repayment to be extended without notice.

Watley filed Forms 1065, U.S. Return of Partnership Income, for 2008, 2009, 2010, and 2011.[6] Watley did not report petitioner's $2.7 million note on Schedules L, Balance Sheets per Books, of any of those returns. Watley conducted business activities in 2012 but did not file a partnership return for that year.

III.    *Pool Boy the Movie, LLC*

Pool Boy the Movie, LLC (Pool Boy), is a Louisiana limited liability company formed on August 24, 2006, to produce the movie *American Summer*. New Moon Pictures, LLC (New Moon), and three individuals who are not relevant to this Opinion executed the initial Pool Boy operating agreement dated August 24, 2006. The operating agreement was amended as of September 30, 2007, to add Watley as a Pool Boy member. From September 30, 2007, through December 31, 2012, Watley owned a 20% membership interest in Pool Boy.

As part of the amendment to the operating agreement, Watley gave Pool Boy a promissory note of $2.7 million (Watley $2.7 million note), payable with interest at 4.75% per annum, in return for its interest in Pool Boy. The Watley $2.7 million note is dated September 30, 2007, and has the same terms as petitioner's $2.7 million note. Watley also received a $300,000 credit in its member's account for prior services that it had provided to Pool Boy. Neither Watley nor either of the Bryans made any payment on the Watley $2.7 million note.

Pool Boy's operating agreement states that its members are not personally liable for any judgment, decree, or court order against Pool Boy or for the debts, obligations, liabilities, or contracts of the company. The amendment to Pool Boy's operating agreement does not alter the personal liability protections provided in the original operating agreement.

Watley was not required to make any capital contribution to Pool Boy in addition to the Watley $2.7 million note. Pool Boy's operating

---

[5]Although the note is dated September 30, 2007, we cannot find in the record the specific day on which the note was executed.

[6] The record does not include any partnership return that Watley may have filed for 2007.

[*5] agreement requires that the managing member make additional capital contributions as needed to produce the movie. New Moon was the managing member of Pool Boy from Pool Boy's formation through December 31, 2012. Watley was not a managing member of Pool Boy at any time through December 31, 2012.

Pool Boy's operating agreement provides that members may not make voluntary capital contributions to Pool Boy. It does not provide for mandatory cash calls to its members (other than the managing member). It does provide that its members have no capital deficit restoration obligation.

Pool Boy filed a Form 1065 and an amended Form 1065 for 2007. The amended return was filed on January 19, 2010, and stated that it was filed to report correctly notes receivable of $6,600,000, among other things. Pool Boy filed Forms 1065 for 2008 through 2012. The 2008 through 2012 returns report notes receivable of $6,600,000 as Schedule L assets.

IV.     *NOTD Investments, LLC*

NOTD Investments, LLC (NOTD), is a Louisiana limited liability company formed on May 22, 2008, to produce the movie *Night of the Demons*. New Moon executed NOTD's operating agreement, dated as of May 22, 2008. At the time New Moon was the sole member.

A second amendment to NOTD's operating agreement was executed, effective August 31, 2009, adding as NOTD members petitioner, Peter M. Hoffman, and others not relevant to this Opinion. Petitioner executed a promissory note of $1 million (payable with interest at 2.75%) in exchange for his interest in NOTD. Neither of the Bryans made any principal payment on that note.

NOTD's operating agreement states that its members are not personally liable for any judgment, decree, or court order against NOTD or for the debts, obligations, liabilities, or contracts of the company. The second amendment to NOTD's operating agreement does not alter the personal liability protections provided in the original operating agreement.

NOTD's operating agreement states that the managing member must make capital contributions as needed to produce the movie. New Moon was the managing member of NOTD from NOTD's formation

[*6] through December 31, 2012. Petitioner was not the managing member of NOTD at any time through December 31, 2012.

NOTD's operating agreement provides that members may not make voluntary capital contributions to NOTD. It does not provide for mandatory cash calls to its members (other than the managing member). It does provide (with limited exceptions not relevant to this Opinion) that its members have no capital deficit restoration obligation.

NOTD filed a Form 1065 for each year 2008 through 2012. NOTD did not issue petitioner a 2008 Schedule K–1, Partner's Share of Income, Deductions, Credits, etc. NOTD's Forms 1065 for 2009 through 2012 all report yearend notes receivable of $4,280,000 as Schedule L assets.

## V. *Autopsy LLC*

Autopsy, LLC (Autopsy), is a Louisiana limited liability company formed on August 24, 2006. Autopsy's members were New Moon and three individuals who are not relevant to this Opinion.

## VI. *New Moon*

New Moon's sole member from August 24 through December 19, 2006, was Seven Arts Pictures, Inc. (SAP Inc.), an entity wholly owned by Mr. Hoffman. New Moon added additional members thereafter. The identity of those additional members is not relevant to this Opinion.

## VII. *Seven Arts Pictures, PLC*

Seven Arts Pictures, PLC (SAP PLC), was a publicly traded company in the United Kingdom and the United States, of which Mr. Hoffman was the chairman, the chief executive officer, and a director. SAP PLC was formed in 2001 and owned interests in 27 completed motion pictures as of 2007. As of March 30, 2007, SAP Inc. owned 8,095,000 ordinary shares of SAP PLC, and public shareholders owned 21,659,000 ordinary shares.

## VIII. *Palm Finance Loan*

Palm Finance Corp. (Palm Finance), New Moon, Pool Boy, and Autopsy executed a loan agreement, effective May 7, 2007, wherein Palm Finance agreed to lend New Moon, Pool Boy, and Autopsy (collectively, Palm Finance loan borrowers) up to $5,500,000 (Palm Finance loan). The Palm Finance loan was guaranteed by SAP Inc. and

[*7] SAP PLC and an affiliate of theirs. Mr. Hoffman conducted negotiations for the Palm Finance loan on behalf of the Palm Finance loan borrowers and the guarantors. The following amounts were disbursed pursuant to the Palm Finance loan to or on behalf of Pool Boy:

| Date | Amount |
|---|---|
| May 9, 2007 | $750,000 |
| May 14, 2007 | 650,000 |
| May 23, 2007 | 550,000 |
| May 30, 2007 | 550,000 |
| June 8, 2007 | 550,000 |
| July 3, 2007 | 150,000 |
| July 20, 2007 | 117,000 |
| July 31, 2007 | 196 |
| July 31, 2007 | 17,000 |
| Aug 22, 2007 | 50,601 |
| Aug. 22, 2007 | 49,399 |
| Sept. 5, 2007 | 60,000 |
| Sept. 17, 2007 | 45,000 |
| Oct. 2, 2007 | 70,000 |
| Feb. 19, 2007 | 150,000 |
| Mar. 1, 2008 | 420 |
| May 1, 2008 | 2,276 |
| July 31, 2008 | 180 |
| Aug. 24, 2012 | 702 |
| **Total** | $3,762,774 |

The Palm Finance loan borrowers were jointly and severally liable for the Palm Finance loan. Any payment on the Palm Finance loan was credited to the loan as a whole and not allocated among the Palm Finance loan borrowers. Neither Watley nor either of the Bryans was personally liable for the Palm Finance loan. Neither Pool Boy, Watley, nor either of the Bryans made any payment on the Palm Finance loan.

In the event of a default on the Palm Finance loan, collection was not limited to the collateral specified in the loan agreement. Palm Finance, however, was not entitled to directly collect on the loan against Watley's or either of the Bryans' assets. Neither Watley nor either of the Bryans pledged any of their assets as collateral or security for the Palm Finance loan, and neither Watley nor either of the Bryans was a

[*8] guarantor of the Palm Finance loan. Neither the Watley $2.7 million note nor petitioner's $2.7 million note was ever pledged as collateral or security for the Palm Finance loan. Nor was either of those notes mentioned in any of the Palm Finance loan documents.

On or about February 15, 2008, Palm Finance agreed to lend the Palm Finance loan borrowers an additional $150,000 to complete the production of movies. Approximately 3½ years later, Palm Finance agreed to lend New Moon, Pool Boy, and Autopsy an additional $250,000 to repay the distributor for the advances in connection with the release of a movie. Neither Watley nor either of the Bryans pledged any collateral or made any payment to Palm Finance as to those additional loans.

The Palm Finance loan was still outstanding as of March 31, 2018. Collection letters on the Palm Finance loan were addressed to Mr. Hoffman.

IX.    *Cold Fusion Media Group, LLC Loan*

NOTD, New Moon, SAP Inc., SAP PLC, and an affiliate of the latter two entities (collectively, Cold Fusion loan borrowers) executed a loan agreement with Cold Fusion Media Group, LLC (Cold Fusion), in or around February 2009 wherein Cold Fusion agreed to lend the Cold Fusion loan borrowers an amount not to exceed $750,000 (Cold Fusion loan). Cold Fusion agreed to lend the funds "in accordance with the cash flow schedule approved by [Cold Fusion] and attached [to the Cold Fusion loan agreement] as Exhibit 'D' (the "Cash Flow Schedule") and the Budget." Exhibit D states that it includes a "1) CASH FLOW SCHEDULE; 2) APPROVED BUDGET; AND 3) APPROVED SCREENPLAY" but does not actually include any cashflow schedule or approved budget.

The Cold Fusion loan was executed by Mr. Hoffman on behalf of each Cold Fusion loan borrower. Neither of the Bryans was personally liable for the Cold Fusion loan. In the event of default, Cold Fusion was not entitled to directly collect on the Cold Fusion loan against either of the Bryans' assets. Neither of the Bryans pledged any property as collateral or security for the Cold Fusion loan, and neither of them was a guarantor of the Cold Fusion loan. The $1 million note petitioner gave to NOTD in exchange for his interest in NOTD was not pledged as collateral or security for the Cold Fusion loan. Nor is that note mentioned in the Cold Fusion loan documents.

[*9]   Neither Watley nor either of the Bryans made any payment on the Cold Fusion loan.  Payments were made by SAP Inc., SAP PLC, and the aforementioned affiliate of those two entities.

X.      *Petitioner's Tax Returns*

A.      *Background*

On his respective tax returns for the subject years, petitioner claimed deductions for NOL carryovers of $3,501,337, $3,389,314, and $3,240,711.  The NOLs result from passthrough losses that petitioner deducted on his 2007, 2008, and 2009 returns, the excesses of which were carried forward as NOLs.  Respondent disallowed those deductions, determining in the notices of deficiency that petitioner (1) failed to substantiate the existence or amounts of the claimed NOLs; (2) failed to substantiate he had a sufficient basis to deduct the claimed NOLs; (3) did not substantiate he was at risk so as to be allowed to deduct the claimed NOLs; and (4) did not substantiate that he materially participated in the activity or activities generating the losses so as to be allowed to deduct the claimed NOLs.  Respondent has since conceded that petitioner materially participated in the activity or activities generating the NOLs disallowed as deductions for 2010, 2011, and 2012.

B.      *2007*

Watley issued petitioner a 2007 Schedule K–1 reporting an ordinary loss of $2,620,290.  Watley issued Ms. Bryan a 2007 Schedule K–1 reporting an ordinary loss of $26,468.  The Bryans reported those losses on their 2007 Schedule E, Supplemental Income and Loss.

Watley included a nonpassive ordinary loss of $3 million attributable to Pool Boy in computing net profit/loss for 2007.  The Bryans' Schedule E loss for 2007, to the extent it exceeded their income for that year, resulted in an NOL that the Bryans carried forward to 2008.

C.      *2008*

The Bryans' 2008 Schedule E reported a loss of $1 million from NOTD.  To the extent that this loss exceeded the Bryans' income for that year, the Bryans added that excess to the NOL that they carried forward from 2007 and carried forward to 2009 the resulting sum.

**[\*10]**  D.  *2009*

For 2009 the Bryans recognized wage income of $1,500, taxable interest income of $165,042, and capital gains income of $1,593, and they claimed a Schedule E loss of $755,226 and an "NOL CARRYOVER TO 2009" of $2,719,784.  The taxable interest was from passthrough entities in which one or both Bryans was a member.  The Bryans' 2009 Schedule E reported a loss of $1 million from NOTD.  To the extent that the reported NOTD loss exceeded the Bryans' income for 2009, the Bryans added that excess to the NOL that they carried forward from 2008 and carried forward to 2010 the resulting sum.

E.  *2010*

For 2010 the Bryans recognized wage income of $73,250, taxable interest income of $223,355, and Schedule E income of $130,466, and they claimed an "NOL CARRYOVER TO 2010" of $3,501,337.  The taxable interest was from passthrough entities in which one or both Bryans was a member.

Petitioner's 2010 tax return was due on October 15, 2011, pursuant to an extension to file.  The IRS received petitioner's return on January 2, 2013.

F.  *2011*

For 2011 the Bryans recognized wage income of $146,000, taxable interest income of $223,250, and Schedule E income of $28,773, and they claimed an "NOL CARRYOVER TO 2011" of $3,389,314.  The taxable interest was from passthrough entities in which one or both Bryans was a member.

Petitioner's 2011 tax return was due on October 15, 2012, pursuant to an extension to file.  That return was received by the IRS on January 7, 2013.

G.  *2012*

For 2012 petitioner recognized wage income of $130,000, taxable interest income of $221,968, and Schedule E income of $338,024, and he claimed a "Prior Year NOL" of $3,240,711.  The taxable interest was from passthrough entities in which petitioner was a member.

[*11] Petitioner's 2012 tax return was due on October 15, 2013, pursuant to an extension to file. That return was received by the IRS on June 16, 2014.

*Discussion*

I.    *Overview*

Section 172(a) allows a taxpayer to deduct NOLs for a taxable year. The amount of the NOL deduction equals the aggregate of the NOL carryovers and NOL carrybacks to the taxable year. *See id.* Section 172(c) defines an NOL as the excess of deductions over gross income, computed with certain modifications specified in section 172(d).

An unused NOL is "carried to the earliest of the taxable years to which . . . such loss may be carried." § 172(b)(2). Any excess NOL that is not applied in one year is carried to the next earlier year. *See id.* Absent an election under section 172(b)(3), an NOL for any taxable year first must be carried back two years and then carried forward over 20 years. *See* § 172(b)(1)(A), (2), (3). A taxpayer who claims an NOL deduction bears the burden of establishing both the existence of the NOL and the amount that may be carried over to the year involved. *See Keith v. Commissioner*, 115 T.C. 605, 621 (2000).

The NOLs correlate to (1) a $3 million loss from Pool Boy for 2007, (2) a $1 million loss from NOTD for 2008, and (3) a $1 million loss from NOTD for 2009. The parties agree that Pool Boy and NOTD realized those losses but dispute whether petitioner may claim any deduction for the subject years with respect to them.

Watley was a member of Pool Boy in 2007, and Pool Boy apportioned the $3 million loss to Watley as its distributive share of a Pool Boy loss. Watley then apportioned its loss (which included in its computation the $3 million Pool Boy loss) to the Bryans, its only members, who reported the Watley loss on their 2007 tax return.

In 2009 petitioner became a member of NOTD, which apportioned to him a $1 million loss for that year. The Bryans reported this loss on their 2009 tax return. Neither of the Bryans was a member of NOTD in 2008.

Petitioner deducted the NOL carryforwards stemming from the above-described losses, on his tax returns for the subject years. Respondent disallowed these deductions. Petitioner has the burden to

**[\*12]** show disallowance of the loss deductions was wrong. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1993). Petitioner does not contend that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

II. *2007 Loss from Pool Boy*

Petitioner must prove three points to overcome respondent's disallowance of the deductions with respect to the Pool Boy loss. First, petitioner must prove that Watley had a sufficient outside basis in Pool Boy to deduct the $3 million loss. *See* § 704(d). Second, he must prove that he had a sufficient outside basis in Watley to deduct the losses that Watley apportioned to him and Ms. Bryan. *See id.* Third, he must prove that he was at risk with respect to Pool Boy's activities. *See* § 465. We will sustain respondent's determination if petitioner fails to establish any of those three points. *See, e.g.*, *Furey v. Commissioner*, T.C. Memo. 2009-35.

A. *Outside Basis*

1. *Overview*

A partner's distributive share of a partnership loss is allowed only to the extent of the adjusted basis of the partner's interest in the partnership at the end of the partnership year in which the loss occurred. *See* § 704(d). A partner's basis in a partnership interest, referred to as outside basis, is determined by looking at (1) any property that the partner contributed to the partnership, (2) any increase or decrease based on the partnership's income, loss, deductions, or credits, (3) any partnership distribution, and (4) the partner's share of partnership liabilities. *See* §§ 705, 722, 733, 752; *see also Rawls Trading, L.P. v. Commissioner*, 138 T.C. 271, 275 n.10 (2012). A partner's contribution of a promissory note to a partnership in which he is a partner does not increase the partner's outside basis. *See VisionMonitor Software, LLC v. Commissioner*, T.C. Memo. 2014-182, at \*10 (and cases cited threat).

The amount of a partnership liability that is included in a partner's basis depends on whether the liability is recourse or nonrecourse. *See* Treas. Reg. §§ 1.752-2(a), 1.752-3(a). Treasury regulations under section 752 provide for the characterization of a liability as recourse or nonrecourse. *See* Treas. Reg. § 1.752-1(a) (defining recourse and nonrecourse liabilities); *see also IPO II v. Commissioner*, 122 T.C. 295, 300 (2004). State law characterization

**[\*13]** of the liability, as well as the characterization of the liability by the parties thereto, is not conclusive.

Treasury Regulation § 1.752-1(a)(1) defines recourse liability as a partnership liability to the extent that a partner or related person bears the economic risk of loss as to the liability. Economic risk of loss (or lack thereof) can result from statutes, the partnership's governing documents, or outside contracts. *See* Treas. Reg. § 1.752-2(b)(3). A partner bears economic risk of loss

> to the extent that, if the partnership constructively liquidated, the partner or related person would be obligated to make a payment to any person (or a contribution to the partnership) because that liability becomes due and payable and the partner or related person would not be entitled to reimbursement from another partner or person that is a related person to another partner.

*Id.* subpara. (1).

For purposes of the constructive liquidation, the regulations deem the following events to occur simultaneously: (1) all partnership liabilities become payable in full, (2) all partnership assets that do not secure a partnership liability have a value of zero, (3) all partnership property is disposed of in a fully taxable transaction for no consideration, (4) the partnership's income, gain, loss, and deductions are apportioned among the partners, and (5) the partnership liquidates. *Id.* A partner's share of a recourse liability equals the portion of that liability for which the partner or a related party bears the economic risk of loss. *See id.* para. (a).

2.      *Watley's Outside Basis in Pool Boy*

In 2007 New Moon, Pool Boy, and Autopsy borrowed money from Palm Finance to finance making movies. Petitioner must prove that the Palm Finance loan gave Watley a sufficient basis in Pool Boy for Watley to deduct the Pool Boy loss. The parties agree that there was no other capital contribution, transaction, or activity that would provide Watley with an outside basis in Pool Boy.

Pursuant to the Treasury regulations, the Palm Finance loan is a recourse liability of Pool Boy since New Moon would bear the economic risk of loss as to that liability. Because Pool Boy was a Louisiana limited

**[\*14]** liability company, its members would generally not be liable for the company's debts and would have no obligation to pay the Palm Finance loan should Pool Boy's assets be insufficient to satisfy the liability. *See* La. Stat. Ann. § 12:1320 (2023). Pool Boy's operating agreement reiterates the members' protected status. The operating agreement states: "No Member, by virtue of his or its status as a Member, shall be bound by or be personally liable . . . for the debts, obligations, liabilities or contracts of the Company." The operating agreement provides that with the exception of the managing member, "[n]o Member shall be required to contribute any additional capital to the Company" and that "[e]xcept to the extent of its share of minimum gain or non-recourse debt minimum gain [neither of which is applicable here] . . . no Member shall have a Deficit Restoration Obligation." These provisions of the operating agreement are consistent with Treasury Regulation § 1.752-2(b)(3)(ii).

In contrast to the other members, New Moon would have an obligation to pay the Palm Finance loan in the event of Pool Boy's constructive liquidation. New Moon was a borrower on the Palm Finance loan, jointly and severally liable for the full amount of debt pursuant to the loan agreement. In the event of a constructive liquidation, when all Pool Boy's liabilities became payable, its assets had no value, and all its property was disposed of for no consideration, New Moon alone would be responsible for payment of the Palm Finance loan. New Moon would not be eligible for reimbursement from any of the other partners.[7] Additionally, as Pool Boy's managing member, New Moon could be obligated to contribute additional capital.

We conclude that Watley acquired no basis in Pool Boy on account of the Palm Finance loan. Accordingly, Watley had no outside basis in Pool Boy throughout the subject years.

### 3. *The Bryans' Outside Basis in Watley*

We conclude likewise that neither of the Bryans had any outside basis in Watley throughout the subject years. The parties agree that petitioner's claim to any basis in Watley must stem from petitioner's

---

[7] Under California law, New Moon may be eligible for reimbursement from its co-borrowers if it pays more than its proportionate share of the Pool Boy loan. *See* Cal. Civ. Code § 1432 (West 2023). However, we do not find in the record that any of the co-borrowers are related to Pool Boy's partners under Treasury Regulation § 1.752-4(b). New Moon's right of reimbursement from these entities is therefore irrelevant for purposes of the economic risk of loss analysis, for reasons we previously discussed.

**[*15]** $2.7 million note, the Watley $2.7 million note, and/or the Palm Finance loan. In cases of tiered partnerships with recourse liabilities, the liabilities of a lower-tier partnership allocated to the upper-tier partnership (the lower-tier partnership's member) equal the amount of economic risk of loss the upper-tier partnership bears with respect to the liabilities and any other liabilities for which the partners of the upper-tier partnership bear the economic risk of loss. Treas. Reg. § 1.752-2(i).

We conclude that Watley (the upper-tier partnership), does not bear any economic risk of loss as to a Pool Boy liability, nor does either of the Bryans bear any economic risk of loss as to a Pool Boy liability.[8] Neither of the Bryans acquired any outside basis in Watley from the Palm Finance loan. Neither do petitioner's $2.7 million note and the Watley $2.7 million note provide either of them with any basis. *See VisionMonitor Software*, T.C. Memo. 2014-182, at *10. Accordingly, neither of the Bryans had any outside basis in Watley during the subject years.

B.    *At Risk*

Even if we found sufficient outside basis to deduct the passthrough loss from either Pool Boy or Watley, petitioner would still have to establish he met the section 465 at risk requirement with respect to Pool Boy's movie-making activity to deduct the Watley losses. *See* § 465(a)(1). An individual taxpayer's loss deduction from certain activities is limited to the aggregate amount for which he is at risk for that activity at the close of that year. *Id.* A taxpayer is at risk with respect to a particular activity to the extent of (1) money and adjusted basis of property he contributed to the activity and (2) amounts borrowed with respect to the activity for which the taxpayer is personally liable for repayment or has pledged property (other than property used in the activity) as security for the loan. § 465(b)(1) and (2).

---

[8] Even if Watley would have been liable for Pool Boy's debts, petitioner would be shielded from paying those liabilities under California law because of Watley's status as a limited liability company. Similar to Louisiana law, California law provides that "no member of a limited liability company shall be personally liable . . . for any debt, obligation, or liability of the limited liability company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a member of the limited liability company." Cal. Corp. Code § 17101(a) (repealed 2013) (current version at Cal. Corp. Code § 17703.04 (West 2023)). Watley's operating agreement does not alter the protections provided by California law; it states that "the rights and liabilities of the parties . . . shall be determined in accordance with the provisions of the laws of the State of California."

**[\*16]** Borrowed amounts are generally not taken into account for at-risk purposes if they are borrowed from someone who has an interest in the activity or from a person related to someone having an interest in the activity (other than the taxpayer). § 465(b)(3)(A). Property pledged as security is not taken into account if the property is directly or indirectly financed by indebtedness secured by the property that was contributed. *See* § 465(b)(2). A taxpayer is not at risk with respect to amounts for which he is protected against loss through nonrecourse financing, guarantees, stop loss agreements, or similar arrangements. § 465(b)(4).

In determining whether a taxpayer is personally liable for repayment of borrowed money under section 465(b)(2), the Court of Appeals for the Ninth Circuit, to which an appeal of this case would normally lie, asks whether the taxpayer would be the obligor of last resort. *See Pritchett v. Commissioner*, 827 F.2d 644, 647 (9th Cir. 1987) (citing *Melvin v. Commissioner*, 88 T.C. 63, 75 (1987), *aff'd*, 894 F.2d 1072 (9th Cir. 1990)), *rev'g and remanding* 85 T.C. 580 (1985). Neither Watley nor either of the Bryans contributed any money used in Pool Boy's movie-making activity. Nor were any of those three personally liable for any amount borrowed for use in Pool Boy's activities.

Additionally, because Watley's operating agreement does not require additional capital contributions, petitioner could potentially be at risk for Pool Boy's activities. *Cf. id.* (finding limited partners had ultimate liability because cash calls were mandatory and economic reality would cause them to be made). While Watley's operating agreement provides for "maximum capital contributions" from its members, if petitioner has already made the maximum capital contribution which that agreement requires of him, he cannot be required to make any further contribution. If on the other hand he has not made his maximum contribution, the contribution would be required only upon his receipt of a notice of a request from a majority in interest of members. Petitioner owned a majority in interest in Watley throughout the relevant timeframe. We find it unlikely that petitioner would make a demand upon himself (or Ms. Bryan) to contribute funds that would be earmarked for the payment of a liability for which neither Watley nor either of the Bryans was personally liable. *Cf. id.*

Petitioner relies on *Melvin*, 88 T.C. 63, to support his view that he was at risk with respect to Pool Boy's movie-making activity. In *Melvin* the taxpayer's wholly owned general partnership, Medici Film Partners (Medici), was a limited partner in ACG Motion Picture

[*17] Investment Fund (ACG), a California limited partnership. *See id.* at 64. Medici acquired its interest in ACG in exchange for a $35,000 cash payment and a $70,000 recourse note in which Medici committed to making capital contributions of $14,000 per year plus interest for five years. *See id.* at 65. ACG acquired a $3.5 million recourse loan from a bank. *See id.* at 66.

As collateral for the loan, ACG pledged most of its assets, including Medici's $70,000 note and the other recourse notes it received from its limited partners for deferred capital contributions. *See id.* The bank loan agreement required that the partners' notes "be physically transferred to the bank in order to protect the bank's security interest in the notes." *See id.* We held that the taxpayer could deduct his pro rata share of the $3.5 million loan and cash payment. *See id.* at 79. We concluded that the taxpayer was at risk for the amounts borrowed by ACG because he was personally liable for the borrowed money. *See id.* at 72–79.

Respondent contends that *Melvin* can be distinguished on the ground that petitioner's $2.7 million note was not given to the lender or specifically pledged as collateral. We do not need to decide whether *Melvin* is distinguishable on that ground because we conclude that *Melvin* is otherwise inapplicable as to the Pool Boy loss because we are not persuaded that petitioner's $2.7 million note was a bona fide debt.

The Ninth Circuit has defined a loan in the context of taxation as "'an agreement, either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree.' The conventional test is to ask whether, when the funds were advanced, the parties actually intended repayment." *Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000) (quoting *Commissioner v. Valley Morris Plan*, 305 F.2d 610, 618 (9th Cir. 1962), *rev'g in part* 33 T.C. 572 (1959), *and rev'g in part Morris Plan Co. of Cal. v. Commissioner*, 33 T.C. 720 (1960)), *aff'g* T.C. Memo. 1998-121. The Ninth Circuit has looked to a transaction as a whole to evaluate whether it is in fact a loan and has referenced the following factors, none of which is dispositive in and of itself: (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure repayment; (5) whether repayment was made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient

[*18] funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan. *Id.*

We have considered the factors, concluding that close scrutiny is appropriate for a transaction between related parties. *See Brown v. United States*, 329 F.3d 664, 673 (9th Cir. 2003); *Advance Int'l, Inc. v. Commissioner*, 91 T.C. 445, 455 (1988). We are not persuaded that the parties to petitioner's $2.7 million note intended that the note be paid. While petitioner through the note promised to pay Watley $2.7 million with interest at 4.75% per year, he did so without setting a payment schedule other than that the note had to be fully paid almost a quarter of a century after the date that the note states that it was made. Payment of the debt also is unsecured and uncollateralized. We do not find in the record that any amount was ever paid on the note or that petitioner had the ability to pay any significant portion of the note.

Petitioner has not established that petitioner's $2.7 million note was executed on or about September 30, 2007, the date on the document, or that either party to the note considered it to represent debt. While Watley's 2007 tax return is not in the record, subsequent returns fail to reflect a $2.7 million promissory note as an asset on Schedule L, and no interest income relating to the note is reported on petitioner's tax returns.[9] Conversely, the Watley $2.7 million note executed in 2007 does appear to be accounted for on Schedule L. In addition while the two notes are essentially identical, unlike the Watley $2.7 million note that was used to procure Watley's ownership in Pool Boy, petitioner has shown no business reason for execution of petitioner's $2.7 million note. We conclude that petitioner's $2.7 million note was created at an undetermined time and intended to be used solely to support petitioner's position that he was at risk with respect to Pool Boy's activities.

We conclude that petitioner has failed to establish that he was at risk with respect to Pool Boy's movie-making activity.

III. *NOTD Losses*

A. *2008 Loss*

Petitioner reported a $1 million passthrough loss from NOTD for 2008. He first became a member of NOTD in 2009. Petitioner is not entitled to deduct a passthrough loss from NOTD for a year before he

---

[9] According to the attached return schedules, the interest income reported flows almost entirely from Pool Boy.

**[\*19]** became a member of NOTD. *See Richardson v. Commissioner*, 76 T.C. 512, 525 (1981), *aff'd*, 693 F.2d 1189 (5th Cir. 1982). Accordingly, we sustain respondent's disallowance.

B.      *2009 Loss*

Petitioner relies on the Cold Fusion loan to contend that he has a basis in NOTD for 2009. Petitioner, however, has not established the amount of any Cold Fusion liability. While the Cold Fusion loan agreement allows for borrowings of up to $750,000 in accordance with certain documents, those documents are not in the record. We do not know the amount (if any) advanced by Cold Fusion to the Cold Fusion loan borrowers under the loan agreement.

Petitioner also has failed to prove that the Cold Fusion loan agreement grants a security interest in all of NOTD's assets (one asset of which was his $1 million note payable to NOTD). We conclude that petitioner cannot establish his outside basis in NOTD.[10] *See Hargis v. Commissioner*, T.C. Memo. 2016-232, at \*29–30, *aff'd sub nom. Hargis v. Koskinen*, 893 F.3d 540 (8th Cir. 2018). Therefore, petitioner had no outside basis in NOTD. Accordingly, he is not entitled to deduct the 2009 loss that NOTD passed through to him.

IV.      *Additional Argument of Petitioner*

Petitioner contends that the Watley loss and the NOTD loss passed through to the Bryans or to him alone. The argument relies on the premise that the three notes—petitioner's $2.7 million note, the Watley $2.7 million note, and the $1 million note payable to NOTD—are assets of the respective entities and therefore collateral for the Palm Finance and Cold Fusion loans pursuant to the loan agreements. Treasury Regulation § 1.752-2(h) addresses the consequences of pledging property, and specifically promissory notes, as security for a partnership liability.

---

[10] Under Louisiana law, limited liability company members are not liable for the company's debts. *See* La. Stat. Ann. § 12:1320(B) (2023). NOTD's operating agreement confirms this in the setting at hand, stating that "[n]o member by virtue of his or its status as a Member, shall be bound by or be personally liable . . . for the debts, obligations, liabilities or contracts of the Company." That agreement adds that, with the exception of the managing member, "[n]o member shall be required to contribute any additional capital to the Company," and "[e]xcept to the extent of its share of minimum gain or non-recourse debt minimum gain [neither if which is applicable here] . . . no Member shall have a Deficit Restoration Obligation."

**[\*20]** Treasury Regulation § 1.752-2(h)(1) and (2) provides that a partner bears the economic risk of loss for a partnership liability to the extent of property he pledges as security for the liability (i.e., direct pledge) or property he contributes to the partnership "solely for the purpose of securing a partnership liability" (i.e., indirect pledge). The regulations specify, however, that a promissory note contributed to a partnership by a partner or related person for the purpose of securing a partnership liability is not taken into consideration for this purpose unless the note is readily tradable on an established securities market. *Id.* subpara. (4).

Petitioner and Watley did not personally provide any property as security for the Palm Finance or Cold Fusion loans. And the notes in question were contributed to the entities, not given to the lenders, and were not specifically designated as collateral in the loan agreements. Palm Finance and Cold Fusion were possibly not aware of these notes at the time of the loan agreements. The notes are not a direct pledge of property as security for a partnership liability within the context of Treasury Regulation § 1.752-2.

We also conclude that the notes do not fall within the indirect pledge provisions of those regulations. To constitute an indirect pledge of property as security for Pool Boy's and NOTD's liabilities, petitioner must establish that the Watley $2.7 million note, petitioner's $2.7 million note, and petitioner's $1 million note to NOTD were "readily tradeable on an established securities market." *See id.* para. (h)(4). Petitioner and the record do not support such a conclusion. Because the notes do not constitute security for the Palm Finance and Cold Fusion loans as either direct or indirect pledges of property, they do not support petitioner's claim of a basis.

V.    *Additions to Tax*

A taxpayer who fails to file a tax return timely is liable for an addition of 5% for each month or fraction of a month that the return is not filed, up to a maximum of 25%, unless the failure to file timely was due to reasonable cause and not to willful neglect. *See* § 6651(a)(1). Respondent has a burden of production which requires that he produce evidence showing that imposition of the section 6651(a)(1) additions to tax is appropriate. *See* § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). Because the record shows that petitioner's returns for 2010, 2011, and 2012 were not filed timely, respondent has met the burden of production.

**[\*21]**  The burden shifts to petitioner to establish that his failure to file his returns timely was due to reasonable cause and not to willful neglect. *See* § 6651(a)(1); *Higbee*, 116 T.C. at 447.  Petitioner contends that he had reasonable cause because he relied on tax professionals to prepare his tax returns in a timely manner.  He contends that his principal tax professional had personal and health issues that resulted in delays in following up with the preparer.

Petitioner's assertions are not supported by the record. A taxpayer's duty to file a timely tax return is nondelegable.  *See United States v. Boyle*, 469 U.S. 241, 249–50 (1985).  Accordingly, petitioner is liable for the late filing additions to tax.

We have considered all arguments, and to the extent not discussed above, we find them to be irrelevant or without merit.  To reflect the foregoing,

*Decision will be entered under Rule 155.*